Herman Hoffman
Kathleen Hoffman
9950 League Line Road
Conroe, TX 77304
 (936) 523-0610
hermanhoffman@earthlink.net
*In Proper Person*

United States Courts
Southern District of Texas
FILED

**OCT 0 6 2017**

David J. Bradley, Clerk of Court

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| HERMAN HOFFMAN and<br><br>KATHLEEN HOFFMAN<br><br>Plaintiffs,<br><br>vs.<br><br>GORDON WELCH, in his official and individual capacities,<br>J.D. LAMBRIGHT, in his official and individual capacities,<br>STUART HUGES, in his official and individual capacities,<br>RONALD CHIN, in his official and individual capacities,<br>WAYNE MACK, in his official and individual capacities,<br>MICHAEL SEILER, in his official and individual capacities,<br>MONTGOMERY COUNTY, TEXAS, and Brett Ligon,<br>HOUSTON SPCA, as an agent of the state,<br>DEBORAH MICHIELSON, in her individual capacity,<br><br>Defendants, | Case No.: 4:17-cv-02332<br><br>**PLAINTIFFS FIRST AMENDED ORIGINAL COMPLAINT per FRCP 15(a)(1)(A)**<br><br>PLAINTIFFS EXHIBITS 1-12 INCORPORATED HEREIN<br><br>**DEMAND FOR TRIAL BY JURY** |

## PLAINTIFFS' FIRST AMENDED ORIGINAL COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COMES NOW,** Plaintiffs Herman Hoffman and Kathleen Hoffman, in *propia persona* in the above-titled cause, pursuant to FRCP 15(a)(1)(A), and file their First Amended[1] Complaint against the captioned Defendants and respectfully bring their causes of action before this court.

### INTRODUCTION & OPENING STATEMEMT

This is an action brought by Plaintiffs against State Officials and other persons acting as agents of the state in their respective roles and in their individual capacities.  These Defendants who, while acting under the color of law, did deter, suppress, or otherwise breach some rights of Plaintiffs guaranteed and protected by the Federal Constitution, particularly rights secured by the 4th and 14th Amendments.

All Defendants, jointly and severally, are the proximate cause of all injury suffered by Plaintiffs relating to this complaint. By use of facially defective and statutorily insufficient warrants certain of these Defendants effected the seizure of 211 pedigree quarter horses which were part of Plaintiffs' joint estate.  Numerous volunteers from all over the state of Texas and elsewhere came onto Plaintiffs property to aid in the seizure and removal of these horses.  Plaintiffs believe that certain of these "volunteers" received one or more of Plaintiffs horses as compensation.

These void warrants were further improperly used by county officials as the legal process to initiate trials within the court system of Montgomery County.  Through the rulings of the Justice Court and County Court at Law, absent jurisdiction, Plaintiffs were divested of this $1,449,000

///

---

[1]   Plaintiffs file this amended complaint as a matter of course pursuant to FRCP 15(a)(1)(A) as no responsive pleading has been filed.

Plaintiffs' First Amended Original Complaint

portion of their estate which was awarded in its totality to certain of these Defendants and others. This is the equivalent of criminal punishment.

As a direct result of the customs, practices, policies, and procedures of Montgomery County, ("COUNTY"), Plaintiffs were intentionally deprived of their constitutional right to be free from unreasonable searches and seizures guaranteed by the Fourth Amendment to the United States Constitution.

As a direct result of the customs, practices, policies, and procedures of COUNTY, certain of these Defendants who were Montgomery County employees developed and proceeded with prosecutions of actions against Plaintiffs where there was no related valid legal process filed in the court, there was no cause of action, there were no parties, there were no rules of court or court procedure, no statutes providing jurisdiction for the claimed prosecution by the state, and no jurisdiction for the equivalent of criminal punishments to be issued by these courts.

With the use of the void judgment gained by the unlawful actions in the Justice Court, a forfeiture of Plaintiff's valuable property was given the appearance of validity. Plaintiffs were defamed and their reputations and businesses have also suffered from the void judgment as it declares that Plaintiffs, both or either of them, have cruelly treated all their horses. By these acts of certain of the Defendants, Plaintiffs suffered due process violations guaranteed them by the United States Constitution specific to the 14th Amendment.

## JURISDICTION, VENUE

1.      Count I of this complaint arises under 42 U.S.C. §1983 (Civil Action for Deprivation of Rights), Count II of this complaint arises under the laws of the State of Texas. The jurisdiction of this court is founded on federal question jurisdiction, 28 U.S.C. §1331, this court also has original jurisdiction pursuant to 28 U.S.C. §1343.

2.      This court has Supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

3.      Venue is proper because all events giving rise to Plaintiffs' causes of action occurred within this district, as provided in 28 U.S.C. § 1391(b)(2).

**PARTIES**

4.      Plaintiff HERMAN HOFFMAN, hereinafter "HOFFMAN", at all times relevant herein, was domiciled in the State of Texas.

5.      Plaintiff KATHLEEN HOFFMAN, hereinafter "KATHLEEN", at all times relevant herein, was domiciled in the State of Texas.

6.      Plaintiff is informed and believes that Defendant, GORDON WELCH, hereinafter "WELCH", is a sworn Deputy Constable for Precinct #5, Montgomery County in the State of Texas, and at all times relevant to this complaint, was acting as an employed, compensated, enriched and rewarded employee for COUNTY.  WELCH is being sued in his individual and official capacities.

7.      Plaintiff is informed and believes that Defendant, J.D. LAMBRIGHT, hereinafter "LAMBRIGHT", is the elected County Attorney for Montgomery County in the State of Texas, and at all times relevant to this complaint, was acting as an employed, compensated, enriched and rewarded employee for COUNTY.  LAMBRIGHT is being sued in his official and individual capacities.

8.      Plaintiff is informed and believes that Defendant, STUART HUGHES, hereinafter "HUGHES", is an assistant County Attorney for Montgomery County in the State of Texas, and at all times relevant to this complaint, was acting as an employed, compensated, enriched and rewarded employee for COUNTY.  HUGHES is being sued in his official individual capacities.

9.      Plaintiff is informed and believes that Defendant, RONALD CHIN, hereinafter "CHIN", is an assistant County Attorney for Montgomery County in the State of Texas, and at all times relevant to this complaint, was acting as an employed, compensated, enriched and rewarded employee for COUNTY.  CHIN is being sued in his individual and official capacities.

10.     Plaintiff is informed and believes that Defendant, WAYNE MACK, hereinafter "MACK", is an elected Justice of the Peace for Precinct #1 of Montgomery County in the State of Texas, and

at all times relevant to this complaint, was acting as an employed, compensated, enriched and rewarded employee for COUNTY.  MACK is being sued in his individual and official capacities.

11.     Plaintiff is informed and believes that Defendant, MICHAEL SEILER, hereinafter "SEILER", was the elected Judge (since resigned) for the 435th District Court of Montgomery County in the State of Texas, and at all times relevant to this complaint, was acting as an employed, compensated, enriched and rewarded employee for COUNTY.  SEILER is being sued in his individual and official capacities.

12.     Defendant MONTGOMERY COUNTY, TEXAS, hereinafter "COUNTY" is a governmental body existing under the laws of the State of Texas within the United States Southern District of Texas.  COUNTY may be served with process by serving the County Judge of Montgomery County, Craig Doyle, at 501 N. Thompson Suite 401 4th Floor, Allen B. Sadler Commissioners' Court Bldg., Conroe, Texas 77301.

13.     Plaintiff is informed and believes that Defendant, HOUSTON SPCA, hereinafter "HSPCA", is a privately held corporation in the State of Texas, and at all times relevant to this complaint, was acting as an agent of the state in behalf MONTGOMERY COUNTY, TEXAS.

14.     Plaintiff is informed and believes that Defendant, DEBORAH MICHIELSON, hereinafter "MICHIELSON", was an employee of HSPCA at the time of her involvement and was acting as an agent of the state. MICHIELSON is being sued in her individual capacity.

### GENERAL FACTUAL ALLEGATIONS

15.     HOFFMAN with the aid of KATHLEEN engaged in a thirty-plus plus year project purchasing key quarter horses and then training, showing, selectively breeding, and engaging in other necessary husbandry practices to develop a premier herd of quarter horses the majority of which were individually registered with the American Quarter Horse Association (AQHA). These pedigree registrations issued by the AQHA are instrumental in aiding in the proper identification, valuation, and marketability of each specific pedigree horse.

16.     This herd of horses, Plaintiffs "Premium Star" brand, was internationally known and highly sought out as they were a unique, valuable, and close foundation bloodline herd of horses (see Exhibit 1, Exhibit 2, and Exhibit 3). The horses in this herd were known to have the highest percentage bloodline in existence of the Champion Quarter Horses "King Fritz" and "Poco Tivio". In June of 2015 HOFFMAN'S herd of horses had numbered 216 head at his ranch in Conroe, Texas.

17.     On June 22, 2015, after east Texas including Montgomery County had suffered almost 8 weeks of severe storms, tornadoes, straight-line winds, and flooding of historic proportion, Governor Gregg Abbott, the Texas Division of Emergency Management (TDEM) and the Federal Emergency Management Agency (FEMA) announced that Montgomery County had been declared a Major Disaster Area (see Exhibit 4 and Exhibit 5). The COUNTY is where HOFFMAN resides and conducted his equine business.

18.     The effects of this major disaster, as would be expected, affected the condition and lives of thousands of people, their homes, their property, their animals, and their livestock in this county. The defendant's property and livestock suffered as well and were not exempt from the effects of these deadly storms.

19.     After coming to HOFFMAN and KATHLEEN's property on the morning of June 24, 2015, Montgomery County District Attorney (MCDA), Brett Ligon, organized a meeting in his office. The goal and purpose of this meeting was to formulate a plan by which the 211 horses would be seized and HOFFMAN and KATHLEEN would suffer multiple prosecutions (Exhibit 6 page 2 para. 2-5 and see Exhibit 7 page 7 – "9:00 a.m.").

20.     The attendees at this meeting included at minimum:

    Brandon Creighton, Texas District 4 Senator

Brett Ligon, MCDA
Michael Holley, deputy MCDA
Chris Smith, Investigator MCDA

LAMBRIGHT, County Attorney (CA)
HUGHES, Assistant CA
CHIN, Assistant CA

WELCH, Deputy Constable
Marshall Williams, Deputy Constable

Craig Doyle, Montgomery County Commissioners Court Judge

MICHIELSON, employee of HSPCA
Robert Wilson, employee HSPCA

Brett Ligon stated that approximately 22 people were present at this meeting some of
which remain unnamed, but included other members of the MCDA staff, CA staff,
Law Enforcement, HSPCA, and at least one other judge.

21.    Despite having made numerous requests through discovery requests and Public

Information Requests, the complete list of people present and any records of this meeting have

been intentionally withheld from HOFFMAN and KATHLEEN.

22.    Subsequent to this meeting, with the assistance of the MCDA's office, Marshall Williams

prepared and submitted an affidavit to obtain a search and seizure warrant (see Exhibit 8). This

warrant is facially insufficient according to Texas Penal Code 18.04(5), i.e. "that the magistrate's

name appear in clearly legible handwritten or typewritten form with the magistrate's signature".

It is unclear on the face of the warrant as to who signed it (See Exhibit 8 page 2).

23.    At approximately 1:00 p.m. on June 24, 2015, Brett Ligon directing at least 60 others

including law enforcement who entered Plaintiffs' property to execute this first warrant (see

Exhibit 9), WARRANT 1. The names of at least 50 of these people have been withheld and are

unknown to HOFFMAN and KATHLEEN.   This warrant granted authority for any law

enforcement officer to seize any animal that appears to have been cruelly treated.  No horses were

seized under this warrant (See Exhibit 8 pp 3-5).

24.     On this same day of June 24, 2015, while this first warrant was active and being executed, WELCH prepared an application to seize "approximately 200 horses", failing to make notice the precise number of 211 distinct and clearly different and valued pedigree horses (see Exhibit 10). WELCH claimed that all of these horses were allegedly cruelly treated, but provided no facts on his application demonstrating any probable cause of cruel treatment. WELCH's application was used to support the "Warrant to Seize Animal", signed by the layman Justice of the Peace Wayne Mack later that same day, WARRANT 2 (see EXHIBIT 10).

25.     On June 24, 2015 WELCH with the aid of MICHIELSON, coordinated the seizing of all 211 horses on the property. MICHIELSON, WELCH, and DOES coordinated and acted in the removal of these pedigree horses from HOFFMAN's property over the following 6 weeks.

26.     Later on June 24, 2015 WELCH made return of the warrant to the Justice Court, specifically to MACK, but WELCH failed to include a complete and accurate list of the 211 horses seized. or ever file the statutorily required certified schedule of the property seized relating to this warrant (see Exhibit 10), as required by Texas Penal Code 18.15. This resulted in horses missing and unaccounted for by WELCH.

27.     On June 30, 2015, layman Justice MACK held a trial prosecuted on behalf of the state by LAMBRIGHT, HUGHES, AND CHIN. MACK made a criminal determination that HOFFMAN or KATHLEEN had cruelly treated all of the approximate horses and ordered a criminal punishment that they be divested HOFFMAN of ownership and "title" of "approximately 200 horses", the $1,449,000.00 of HOFFMAN's property. MACK also taxed costs against HOFFMAN and KATHLEEN in the amount of $122,254.87 (see Exhibit 11).

28.     HOFFMAN and KATHLEEN were informed that they could appeal MACK's ruling to a

higher court, but they would be required to post a $200,000 bond.  HOFFMAN and KATHLEEN did timely post such a bond and a "trial de novo" in the County Court at Law 2.

29.     On July 30, 2015, an appeal of MACK's order was held in the Montgomery County County Court at Law #2, SEILER presiding in which HUGHES and CHIN acted as prosecutors.  MACK did not have jurisdiction to hold any trial and therefore SEILER was without jurisdiction to hold a trial de novo in the county court at law #2.

30.     In his August 4, 2015 order, (see Exhibit 12), SEILER duplicated Mack's ruling regarding the seizure and divestiture of "approximately 200 horses", but increased the court costs assessed against HOFFMAN and KATHLEEN to $485,331.68.

31.     Brett Ligon, MCDA, was the policy maker for the COUNTY.  LIGON gave legal advice to Marshall Williams and WELCH for pursuing the warrants, executed the seizure related to these horses, and oversaw the prosecution of these two trials referred to herein.

### COUNT I
### (42 U.S.C. § 1983; Unreasonable Searches and Seizures- 4th Amendment)

32.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 31 above and incorporate the same as if set forth in full.

33.     Defendant WELCH knew or should have known that there was an active warrant being executed by his co-worker, Marshall Williams in which Williams was ordered to seize any animal that appeared to be cruelly treated.  WELCH knew or should have known that any warrant application he prepared and submitted to search for and seize the same locations for the same items at the same time of an existing warrant would be void ab initio and his actions were arbitrary.

34.     In so doing, Defendant WELCH violated Plaintiffs' rights relating to the 4th Amendment and did so with deliberate indifference.

///

35.     As a direct and proximate consequence of the acts of this Defendant, HOFFMAN and KATHLEEN have suffered and continue to suffer injury therefrom and are entitled to recover damages accordingly.

## COUNT II
### (42 U.S.C. § 1983; Unreasonable Search and Seizure – 4th Amendment)

36.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 35 above and incorporate the same as if set forth in full.

37.     Defendant WELCH knew or should have known that his prepared application for the search and seizure warrant on its face presents no facts of alleged cruel treatment or any other such required probable cause statement to justify seizing any of the 211. Any reasonable officers' review of this warrant would conclude that there is no probable cause to justify this search and seizure, but WELCH did so arbitrarily act and seize all of these horses.

38.     In so doing, Defendant WELCH violated Plaintiffs' rights relating to the 4th Amendment and did so with deliberate indifference.

39.     As a direct and proximate consequence of the acts of these Defendants, HOFFMAN and KATHLEEN have suffered and continue to suffer injury therefrom and are entitled to recover damages accordingly.

## COUNT III
### (42 U.S.C. § 1983; Unreasonable Search and Seizure – 4th Amendment)

40.     Plaintiff repeat and re-allege the allegations contained in paragraphs 1 through 39 above and incorporates the same as if set forth in full.

41.     Defendants WELCH, knew or should have known that the search and seizure warrant on its face lacks the particularity requirement as prescribed in the Constitution. The warrant issued and executed in this case provides no particularity and is therefore so facially defective that any reasonable executing officer could not presume it to be valid.

42.     MICHIELSON and HSPCA, employees and volunteers who are unnamed and unknown to Plaintiffs, assisted WELCH in the execution of this void warrant.

43.     By executing a facially defective warrant, Defendants WELCH, MICHIELSON, and HSPCA violated Plaintiffs' rights relating to the 4th Amendment and so acted arbitrarily and with deliberate indifference to Plaintiffs rights.

44.     As a direct and proximate consequence of the acts of these Defendants, HOFFMAN and KATHLEEN have suffered and continue to suffer injury therefrom and are entitled to recover damages accordingly.

**COUNTY IV**
**(42 U.S.C. § 1983; Due Process Violation - 14th Amendment)**

45.     Plaintiff repeat and re-allege the allegations contained in paragraphs 1 through 44 above and incorporate the same as if set forth in full.

46.     WELCH knew or should have known that a certified schedule of the property seized is required to be attached to the warrant upon return to the court. This required certified schedule of property seized was not attached to the returned warrant nor was it ever filed with the court.

47.     MICHIELSON and HSPCA, employees and volunteers who are unnamed and unknown to Plaintiffs, assisted WELCH in seizing and securing the horses and aided in the inventorying of the horses.

48.     WELCH has a statutorily defined duty to attach a certified schedule of the property seized to the warrant when an officer returns the warrant to the issuing court. WELCH, MICHIELSON, and HSPCA violated HOFFMAN's and KATHLEEN's due process protections guaranteed by the 14th amendment by failing to file this certified schedule of property seized with the court in question to provide an accurate and detailed list of the property seized.

49.     Filing a certified schedule of the property seized would ensure that there was a precise inventorying of all animals seized and would prevent any of this property from being stolen,

damaged, sold, traded out, or otherwise tampered with or fabricated.  At least eleven of these valuable horses are unaccounted for.

50.     In so acting, WELCH violated Plaintiffs rights guaranteed and protected by the 14th Amendment. WELCH so acted arbitrarily and with deliberate indifference to HOFFMAN's and KATHLEEN's constitutionally protected right and is the proximate cause of the injury they suffered therefrom.

51.     As a direct and proximate consequence of the acts of this Defendant, HOFFMAN and KATHLEEN have suffered and continue to suffer injury therefrom and are entitled to recover damages accordingly.

**CAUSE V**
**(42 U.S.C. § 1983; Unreasonable Search and Seizure - 4th Amendment)**

52.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 51 above and incorporates the same as if set forth in full.

53.     MACK knew or should have known that the application for warrant prepared by WELCH contained no factual statements demonstrating probable cause of the crime of animal cruelty by HOFFMAN and KATHLEEN regarding any of the "approximately 200" horses, that all 211 horses were not even listed in the warrant, and that no reasonable magistrate could issue the requested warrant.

54.     In so acting, MACK violated Plaintiffs rights guaranteed and protected by the 4th Amendment by signing a warrant with no probable cause, MACK acted arbitrarily and with deliberate indifference to HOFFMAN and KATHLEEN's right to be free from unreasonable searches and seizure and is the proximate cause of this injury.

///

///

55.     As a direct and proximate consequence of the acts of this Defendant, HOFFMAN and KATHLEEN have suffered and continue to suffer injury therefrom and are entitled to recover damages accordingly.

### CAUSE VI
### (42 U.S.C. § 1983; Due Process Violation - 14th Amendment)

56.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 55 above and incorporates the same as if set forth in full.

57.     MACK knew or should have known that the deficiencies of the application and warrant prevented the Justice Court from acquiring jurisdiction to hold a hearing under Texas Health and Safety Code § 821.022(b) in which he could determine if the animal in question had been cruelly treated.

58.     In so acting, MACK violated Plaintiffs rights guaranteed and protected by the 14th Amendment by holding a hearing when no valid warrant or other lawful process existed granting the court jurisdiction.  MACK acted arbitrarily and with deliberate indifference to HOFFMAN and KATHLEEN's due process protections and is the proximate cause of this injury

59.     As a direct and proximate consequence of the acts of this Defendant, HOFFMAN and KATHLEEN have suffered and continue to suffer injury therefrom and are entitled to recover damages accordingly.

### CAUSE VII
### (42 U.S.C. § 1983; Due Process Violation - 14th Amendment)

60.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 59 above and incorporates the same as if set forth in full.

61.     MACK knew or should have known that absent any sufficient legal process he lacked jurisdiction to hold a trial of any kind, and make any finding against HOFFMAN and

KATHLEEN. Absent such process, HOFFMAN and KATHLEEN could not have been "Defendants" in a state matter in this court

62.     In so acting, MACK violated Plaintiffs rights guaranteed and protected by the 14th Amendment. MACK so acted arbitrarily and with deliberate indifference to the Plaintiffs constitutionally protected right and is the proximate cause of this injury to HOFFMAN and KATHLEEN who suffered therefrom.

63.     As a direct and proximate consequence of the acts of this Defendant, HOFFMAN and KATHLEEN have suffered and continue to suffer injury therefrom and are entitled to recover damages accordingly.

## CAUSE VII
### (42 U.S.C. § 1983; Due process violation – 14th Amendment)

64.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 63 above and incorporates the same as if set forth in full.

65.     MACK knew or should have known that there was no process filed in the Justice Court for a civil cause of action by which he could order the divesture of horses from HOFFMAN and KATHLEEN, award ownership of Plaintiffs horses to HSPCA, and personally bind HOFFMAN AND KATHLEEN by ordering a judgment in the amount of $122,254.87 in court costs.

66.     Through this void order, MACK awarded Plaintiffs' property to a non-party to any action, and taxed a financial judgment against HOFFMAN and KATHLEEN without due process of law.

67.     In so acting, MACK violated Plaintiffs rights guaranteed and protected by the 14th Amendment. MACK so acted arbitrarily and with deliberate indifference to HOFFMAN and KATHLEEN's constitutionally protected rights and is the proximate cause of this injury to HOFFMAN and KATHLEEN who suffered therefrom.

68.     As a direct and proximate consequence of the acts of this Defendant, HOFFMAN and KATHLEEN have suffered and continue to suffer injury therefrom and are entitled to recover damages accordingly.

**CAUSE VIII**
**(42 U.S.C. § 1983; Due Process Violation - 14th Amendment)**

69.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 68 above and incorporates the same as if set forth in full.

70.     SEILER knew or should have known that because the MACK lacked jurisdiction due to the fatally defective warrant regarding HOFFMAN and KATHLEEN no appeal could be made to County Court at Law #2.

71.     Despite this complete lack of jurisdiction, SEILER presided over a trial de novo in which HOFFMAN and KATHLEEN were tried as defendants.  At the conclusion of this void trial, SEILER Plaintiffs' property to a non-party, HSPCA to any action, and order that they pay court costs in the amount of $485,331.68.

72.     By so acting, SEILER violated Plaintiffs rights guaranteed and protected by the 14th Amendment. SEILER so acted arbitrarily and with deliberate indifference to HOFFMAN and KATHLEEN's constitutionally protected rights and is the proximate cause of this injury to HOFFMAN and KATHLEEN who suffered therefrom.

73.     As a direct and proximate consequence of the acts of this Defendant, HOFFMAN and KATHLEEN have suffered and continue to suffer injury therefrom and are entitled to recover damages accordingly.

///

///

///

## COUNT IX
### (42 U.S.C. § 1983; Unreasonable Searches and Seizures - 4th Amendment)

74.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 73 above and incorporates the same as if set forth in full.

75.     LAMBRIGHT, HUGHES and CHIN as seasoned prosecutors knew or should have known that the WELCH warrant was fatally defective and void yet they persisted in prosecuting HOFFMAN and KATHLEEN in MACK's court on June 30, 2015.

76.     By so acting, LAMBRIGHT, HUGHES and CHIN violated Plaintiffs rights guaranteed and protected by the 4th Amendment. These Defendants so acted arbitrarily and with deliberate indifference to HOFFMAN and KATHLEEN's constitutionally protected 4th amendment right and are the proximate cause of this injury to HOFFMAN and KATHLEEN who suffered therefrom.

77.     As a direct and proximate consequence of the acts of these Defendants, HOFFMAN and KATHLEEN have suffered and continue to suffer injury therefrom and are entitled to recover damages accordingly.

## COUNT X
### (42 U.S.C. § 1983; Unreasonable Searches and Seizures - 4th Amendment)

78.     Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 77 above and incorporates the same as if set forth in full.

79.     LAMBRIGHT, HUGHES and CHIN as seasoned prosecutors knew or should have known that the WELCH warrant was fatally defective and therefore, void and that the Justice Court had no jurisdiction to hold a proceeding involving HOFFMAN and KATHLEEN. These Defendants should have therefore know that SEILER's court was deprived jurisdiction to hold any trial regarding the same matter.

80.    Despite SIELER's court having no jurisdiction therefrom, these Defendants persisted in prosecuting HOFFMAN and KATHLEEN in SEILER's court on July 30, 2015.

81.    By so acting, LAMBRIGHT, HUGHES and CHIN violated Plaintiffs rights guaranteed and protected by the 4th Amendment, for the second time. These Defendants so acted arbitrarily and with deliberate indifference to HOFFMAN and KATHLEEN's constitutionally protected 4th amendment right and are the proximate cause of this injury to HOFFMAN and KATHLEEN who suffered therefrom.

82.    As a direct and proximate consequence of the acts of these Defendants, HOFFMAN and KATHLEEN have suffered and continue to suffer injury therefrom and are entitled to recover damages accordingly.

### COUNT XI
### (42 U.S.C. § 1983; Unreasonable Searches and Seizures - 4th Amendment)

83.    Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 82 above and incorporates the same as if set forth in full.

84.    The District Attorneys office as policy maker for COUNTY has devised a crafty method of issuing a warrant for seizure of animals which will not contain probable cause in order to illegally divest an owner of their property. These warrants are represented as "civil" in order to disguise the flagrant lack of probable cause within their 4 corners, and circumvent legitimate due process. These warrants are then used to seize lawfully owned animals from private persons, permanently strip them of property, prosecute a mock action in a court lacking jurisdiction, and thereby violate their 4th amendment rights.

85.    As a custom practice and policy reaching back decades, imposed by the District Attorney's office, the County Attorney's office, the justice and county courts at law and law enforcement, thousands of animals have been divested from owners in this manner by COUNTY. This policy

has been published by the District Attorney's and County Attorney's offices in official press releases, and newsletters several times since the seizure of HOFFMAN AND KATHLEEN's horses.

86.     By so acting, COUNTY has violated Plaintiffs rights guaranteed and protected by the 4th Amendment. COUNTY has so acted arbitrarily and with deliberate indifference to HOFFMAN and KATHLEEN's constitutionally protected 4th amendment right and are the proximate cause of this injury to HOFFMAN and KATHLEEN who suffered therefrom.

87.     As a direct and proximate consequence of the acts of COUNTY, HOFFMAN and KATHLEEN have suffered and continue to suffer injury therefrom and are entitled to recover damages accordingly.

**WHEREFORE**, Plaintiff prays for relief against Defendants, and each of them, as follows:

a.  Enter Judgment against Montgomery County, Texas and each and every defendant individually named and find them jointly and severally liable;

b.  Find that the Plaintiffs are the prevailing parties in this case and award attorneys fees and costs, to federal law, as noted against defendant Montgomery County, Texas and the individually named defendants;

c.  Award damages to Plaintiffs for the violations for their rights secured, guaranteed an, and protected by the Federal Constitution;

d.  Award pre- and post- judgment interest;

e.  Award punitive damages against all individually named defendants;

f.  And grant such other and further relief as appears reasonable and just, to which Plaintiffs show themselves entitled.

**DEMAND FOR TRIAL BY JURY REQUESED HEREIN**

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS**

**TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.**

DATED this _5_ day of __Oct__ , 2017.

_____                    _____
Original Signature          Herman Hoffman

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS**

**TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.**

DATED this _5_ day of __Oct__ , 2017.

_____                    _____
Original Signature          Kathleen Hoffman

9950 League Line Road
Conroe, TX 77304
 (936) 523-0610
hermanhoffman@earthlink.net
*In Proper Person*

Plaintiffs' First Amended Original Complaint                    Page 19

No. 4:17-cv-02332
Herman and Kathleen Hoffman v Gordon Welch, et al
Plaintiffs' First Amended Original Complaint

# EXHIBIT LIST

**Number of Pages**

Exhibit 1- National Foundation Quarter Horse Journal –
2010 Collector Journal – Cover and Back Page-............................................2

Exhibit 2- National Foundation Quarter Horse Journal – 2010 Collector
Journal – Article #1- "What is a Quarter Horse, Article #2 –
"Tribute to 'The' Cornerstone Quarter Horse Stallions"-...................................1

Exhibit 3-  National Foundation Quarter Horse Journal – 2010 Collector
Journal – Article #1- "King Fritz, Article #2 – "Poco Tivio"................................ 3

Exhibit 4 – Montgomery County Judge Craig Doyle – June 22, 2015
Major Disaster Declaration – Press Release ...............................................1

Exhibit 5-  April 18, 2017 - Public Information Request regarding
Montgomery County Judge Craig Doyle's Major Disaster
Declaration June 2015 and Judge Doyle's Response- 12 pages).........................10

Exhibit 6-  TDCAA Newsletter, "To Seize or Not to Seize" – written by
Montgomery County Assistant Attorneys, Stuart Hughes and
Ronald Chin ..................................................................................5

Exhibit 7-  Chris Smith- Notes Lead Investigator Montgomery County
District Attorney's Office................................................................18

Exhibit 8-  Seizure Warrant #1, Return of Warrant And Inventory, and
Application for Warrant by Deputy Constable Marshall Williams
- June 24, 2015..............................................................................8

Exhibit 9 – Montgomery County District Attorney, Brett Ligon,
June 25, 2015 Press Release................................................................1

Exhibit 10- Seizure Warrant #2, Return of Warrant, and Application for
Warrant by Deputy Constable Gordon Welch - June 24, 2015.........................7

Exhibit 11 – July 8, 2015 Amended Order of Justice of the Peace Wayne Mack....................3

Exhibit 12 – August 4, 2015 Order of Judge Michael Seiler.............................................4

EXHIBIT 1

(National Foundation Quarter Horse Journal – 2010 Collector Journal
Cover and Back Page)

Case 2:17-cv-00372   Document 13   Filed in TXSD on 10/09/17   Page 22 of 92

National Foundation Quarter Horse Journal

# 2010 Stallion Edition

## "First in a Series of Collector's Journals"

### Cornerstone Stallions Profiles

Joe Hancock
Driftwood
Pep Up
Pretty Buck
Royal King
Beaver Creek
Skipper W
Poco Tivio
Leo San
Poco Dell
King's Pistol
Joe Cody
Poco Pine
King Fritz
Blondy's Dude
Blue Valentine
Mr Baron Red
Two Eyed Jack
Jackie Bee
Hollywood Jac 86

## TAYLOR-MADE
*the Joe Taylor Horses of Moab, UT*

## MEL POTTER
*a True Believer*



Ross Hecox



**Premium Star**

*Quality Speaks for Itself*

**Timothy Tivio, last breeding son of the legendary Poco Tivio!
We have an extensive selection of young breeding stallions,
performance prospects, broodmares and broke horses.**

# Poco Tivio & King Fritz
## *Highest Percentage in Existence*

Call for Breeding Contracts & Fees for 2010

# Premium Star
### Herman & Kathleen Hoffman
**10066 League Line Road, Conroe, Texas 77304**

# 936-856-9988
# www.premiumstar.com

EXHIBIT 2

(National Foundation Quarter Horse Journal – 2010 Collector Journal
Article #1 – What is a Quarter Horse, Article #2 –Tribute to the Cornerstone Quarter Horse
Stallions)





# What is a Foundation Quarter Horse?

by Frank Holmes

As far as trying to define exactly what constitutes a "Foundation Quarter Horse" is concerned, it's not that hard; at least not as far as technical terms are concerned.

The New World Dictionary defines foundation as: "a part on which the other parts rest for support" or "a part on which other parts are overlaid."

When you think about it, either of these two definitions could fit the bill. There is, after all, no doubt that horses like King, Joe Hancock, Driftwood, Poco Bueno and others of their kind did serve as the foundation – or base – upon which the breed we now know as the American Quarter Horse was built.

But trying to define something like the Foundation Quarter Horse in technical terms does present something of a problem; because the fact of the matter is that the nomenclature is less of a "term," and more of a "tale."

Put another way, the Foundation Quarter Horse is a story – steeped in history, rich in lore and populated by colorful characters.

It is the tale of King and Byrne James in pursuit of a speedy calf at a rodeo in South Texas; the story of Leo flying down a Pawhuska, Oklahoma, straightaway; and the account of Blue Valentine and Hyde Merritt tripping a steer at the Cheyenne Frontier Days.

It is a saga that conjures up images of such great man and beast teams as Jess Hankins and King, Bud Warren and Leo, E. Paul Waggoner and Poco Bueno, Howard Pitzer and Two Eyed Jack, and Duane Walker and Jackie Bee – Hall of Fame Horsemen and Horses, each and every one.

What's more, the Foundation Quarter Horse is a story built upon and around the very heart and soul of the American West. From the hot and dusty plains of the Southwest to the high desert country of the far Northwest, the Foundation Quarter Horse helped settle the West.

He carried starry-eyed settlers and homesteaders in pursuit of their dreams; and steely-eyed cattlemen in search of their grassy empires. He chased fast cash on furrowed racetracks, and fast calves in dusty rodeo arenas. He pushed fat steers up the Chisholm Trail, and even pulled "two-row listers" over newly-cultivated fields.

He was, as one legendary pioneer horsewoman so aptly put it, "a willing work partner throughout the week, and our greatest source of pride during the week-end."

In the end, the animal winds up being hard to define, but easy to recognize. He is less of an entity and more of an emotion; less of a physical presence and more of a way of life; less of a possession and more of a partner.

He is the Foundation Quarter Horse.



# EXHIBIT 3

(National Foundation Quarter Horse Journal – 2010 Collector Journal
Article #3 – King Fritz, Article #4 –Poco Tivio)



Clockwise
from right:

# Tribute to 'The'

The term "foundation sire" is a broad one, and one that can and should encompass hundreds of early-day Quarter Horses. And, just as we are prone to hold our favorite athletic team in higher esteem than any of the others, so too are we likely to favor one "Cornerstone Quarter Horse" sire over another.

No matter what our individual leanings are, however, I think we can all agree that King, Leo and Poco Bueno are deserving of universal acclaim. No matter what Western Horse show and performance venue you prefer, you will be hard-pressed not to find champions in the field that don't trace to one or more of these Quarter Horse icons.

Nowhere is their influence more readily apparent in that one award that was once the standard by which all Quarter show horses were judged – the AQHA Championship.

Between them, the three super sires bequeathed the breed with 80 AQHA Champions; and on the All-Time Leading Sires of AQHA Champions List, the trio and their descendants occupy fully half of the 20 slots.

On the All-Time Leading Broodmare Sires of AQHA Champions List, Leo and King occupy the two top spots with 58 and 50 respectively; while Poco Bueno has 23 to his credit. And, again, they and their descendants hold down nine of the 20 slots on the list.

And the AQHA Hall of Fame trio's influence goes far beyond a couple of leading sires lists. In halter, racing, reining, rodeo, cutting and pleasure, you'll find the names of King, Leo or Poco Bueno behind champion after champion.

For this, they should be honored and never forgotten.

# KING FRITZ P-58,532

King Fritz, a 1956 bay stallion by Power Command and out of Poco Jane by Poco Bueno, was bred by Robert Q. "Bob" Sutherland of Kansas City, Missouri.

Power Command, Fritz' sire, was shown to his AQHA Championship by Sutherland trainer John Balliver. The lanky, Texas-bred who also showed to best of the first Sutherland-bred AQHA Champions, rated. Command a near-great lifetime horse.

Poco Jane, Fritz's dam, was a grandaughter of Pretty Boy and Pretty Boy. Bred by the Waggoner Ranch ... and ... companied ... in halter, she got ... prolific one ... and was hit and ... most killed by a car. Purchased by ... Sutherland ... the ... was bred to Power Command ... of ... by Sutherland ... TSalar Ranch, sale to Raymond Guthrie ... Oregon. So, although bred by Sutherland, King Fritz was mainly raised in Oregon.

At the age of three months, the King and Poco Bueno grandson was purchased by Fritz and Helen Watkins of Wasco, Oregon and registered as King Fritz. Known ... middle-of-the-road horse with an easy disposition and temperament, the stallion was trained and shown to an AQHA Championship by ... such as Ray Junker, Buster Smith, Al Chandler and Jerry Ortega, the one that finished the job in 1960. ...



King Fritz, an AQHA Champion show horse and founder of a West Coast performance dynasty, is shown here as a young horse with owner Fritz Watkins of Wasco, Oregon.

... AQHA Champion ... and the earnings of four world championships, one Superior Halter award and 11 Superior Performance awards (in open, amateur and youth competition). In NCHA competition, his get earned $34,315.

In 1971 the Watkins sold King Fritz and 10 mares to ...



Fritz Command, a 1967 dun stallion by King Fritz and out of Sutherland's Miss, was likewise an AQHA Champion.

... trainer named ... Vogt for $50,000 and the mares cost ... and Vogt borrowed all but $5,000 of the money from ... understanding banker, using the horses as collateral.

After being acquired by Vogt, King Fritz stood at the White Rail Ranch in Clovis for a $1,000 fee. The stallion and his offspring — most of whom had "Chex" in their name — "caught" on like wild-fire and Vogt was able to pay off his bank loan the first year.

Over the course of the next decade, horses like Shirley Chex, Karen Chex, Mitzi Chex and Royal Chex began to dominate the West Coast open stock horse and reined cow horse scene.

As for King Fritz himself, he had to be humanely put to sleep in 1975, at the age of 19, as the result of what was diagnosed to be a damaged vertebra near his poll.

Two of the stallion's AQHA Champion sons — Bueno Chex and Fritz Command — have done the most to ensure the continuity of the line.

## King Fritz

| | | |
|---|---|---|
| Power Command | King | Zantanon |
| | | Jabalina |
| | Crickett McCue | Barney McCue |
| | | Fanny McCue |
| Poco Jane | Poco Bueno | King |
| | | Miss Taylor |
| | Mary Jane W | Pretty Boy |
| | | Waggoner Mare |

# POCO TIVIO P-17,396



Poco Tivio, shown here at the height of his show career, was one of the breed's first AGHA Champions.

Doc's Dee Bar, a 1963 sorrel stallion by Doc Bar and out of Lura Tivio, was one of his era's top show horses and sires. He remains a shining example of one of the breed's greatest golden crosses — Doc Bar on Poco Tivio-bred mares.

## Poco Tivio

{ Poco Bueno { King { Tantanoin
Jabalina
Poco Bueno
{ Miss Taylor { Maehly Hickory Bill
Dodger

{ Pretty Boy { Little Maud
{ Shelfwin { Blackburn
{ Mare by Blackburn { Waggoner Mare

# EXHIBIT 4

(Montgomery County Judge Craig Doyle's June 22, 2015
Major Disaster Declaration Press Release)



## CRAIG DOYAL
COUNTY JUDGE
MONTGOMERY COUNTY

501 N. Thompson, Suite 401
Conroe, TX 77301
E-Mail: cojudge@mctx.org

Conroe: (936) 539-7812
Houston: (281) 364-4285
Fax: (936) 760-6919

For Immediate Public Release:

Montgomery County has been notified that the federal government has included it in its federal disaster declaration for Texas, opening the door for individual assistance funds to begin flowing to eligible residents.

The disaster declaration was expanded at the request of Montgomery County and the state of Texas, said County Judge Craig Doyal.

"We are very pleased that the federal government has responded so quickly to our disaster declaration; this step will help ensure that eligible residents get the help they need to get back on their feet," Judge Doyal said.

The declarations were made as a result of the severe storms, tornadoes, straight-line winds and flooding that occurred between May 4, 2015 and June 19, 2015, according to the Texas Division of Emergency Management (TDEM) and the Federal Emergency Management Agency (FEMA).

On June 15 Judge Doyal issued a local disaster declaration and submitted a request for state and federal assistance to the governor.

On June 22, 2015 Montgomery County was added to the State Disaster Declaration by Gov. Greg Abbott.

Since the county has been presidentially declared for Individual Assistance, FEMA inspectors will then begin making appointments with residents who applied for assistance, said Nicky Kelly, deputy Emergency Management Coordinator for Montgomery County.

The inspector will set up a date and time to meet with the home owner and will go over what documentation needs to be provided for proof of residency. A fact sheet is attached to explain the process in more detail and answer frequently asked questions. Residents who have not already registered can do so by calling FEMA at 1- 800-621-FEMA(3362) or by visiting their website at www.disasterassistance.gov.

A physical location for a disaster recovery center will be set up in Montgomery County once an appropriate location is established by the State and FEMA, Kelly said. This location will be released to the public once it is determined and ready for operation. This location will provide a face to face contact for disaster survivors to go and speak with representatives from the State and FEMA.

If residents are denied assistance from FEMA, they may appeal that decision. In addition, they would then be eligible to apply for assistance from the Small Business Administration. Montgomery County already had been added to the Small Business Administration (SBA) declaration due to being a contiguous county with Harris County. Information concerning the application process for the SBA assistance can be found on the Montgomery County OEM website at www.mctxoem.org.

# EXHIBIT 5

(April 18, 2017 Public Information Request to Montgomery County Judge Craig Doyle
and response regarding June 22, 2015 Major Disaster Declaration)

RECEIVED

April 18, 2017

APR 2 1 2017

Montgomery County Judge

Craig Doyal, County Judge, Montgomery County Texas
Or Attn: Custodian of Records
501 North Thompson
Suite 401
Conroe, TX  77301

Greetings

This Public Information Request is being made to your office, department, or agency specific to
the TEXAS Government Code, Title 5, Subtitle A, Chapter 552 (see attached).

In accordance with said Code, specific to attachment #2, "Immediate Public Release" by Craig
Doyle regarding the disaster declaration any records including copies of:

1) The June 15, 2015 disaster declaration issued by Judge Craig Doyle (para. #5),
2) The submitted request for state and federal assistance by Judge Craig Doyle to
Governor Greg Abbott (para. #5)
3) The presidential declaration for Montgomery County Texas regarding individual
assistance (para. #7)

As you are aware the Texas Public Information Act requires that you "promptly produce" the
requested information and records.  If you expect a significant delay in responding to this
request, please contact me with information about when I might expect copies and the requested
information.

If said County Judge wishes to withhold information from me, you must seek an attorney general
decision within ten business days of your receipt of this request and state the exceptions to
disclosure that said County Judge believes are applicable. Be advised that this County Judge
must also send me a copy of this letter directed to the attorney general within ten business days
of receipt of this letter.

I have enclosed a money order in the amount of $15.00 which should cover the cost of any
copies and the mailing.  If the cost exceeds this amount, please notify me in writing at the
address below and I will forward any balance to your office immediately.

Thank you for your most expedient response.

Regards

Herman Hoffman
9950 League Line Road
Conroe, TX  77304

Cc: File
Attachment 1

# **Attachment 1**

TEXAS GOVERNMENT CODE

TITLE 5. OPEN GOVERNMENT; ETHICS

SUBTITLE A. OPEN GOVERNMENT

CHAPTER 552. PUBLIC INFORMATION

Sec. 552.001. POLICY; CONSTRUCTION.

(a) Under the fundamental philosophy of the American constitutional form of representative government that adheres to the principle that **government is the servant and not the master of the people,** it is the policy of this state that each person is entitled, unless otherwise expressly provided by law, at all times to complete information about the affairs of government and the official acts of public officials and employees.

**The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know.**

**The people insist on remaining informed so that they may retain control over the instruments they have created.** The provisions of this chapter shall be liberally construed to implement this policy.

(b) This chapter shall be liberally construed in favor of granting a request for information.

Added by Acts 1993, 73rd Leg., ch. 268, Sec. 1, eff. Sept. 1, 1993.



**JAMES FREDRICKS**
CHIEF OF STAFF
MONTGOMERY COUNTY JUDGE
CRAIG DOYAL

501 N. Thompson, Suite 401
Conroe, TX 77301
E-Mail: james.fredricks@mctx.org

Direct Line: (936) 760-6911
Houston: (281) 364-4285
Fax: (936) 760-6919

April 28, 2017

Herman Hoffman
9950 League Line Road
Conroe, Texas 77304

Dear Mr. Hoffman:

On April 21, 2017, our office received your open records request for certain information regarding the disaster declaration and any records including copies of:

1) The June 15, 2015 disaster declaration issued by Judge Craig Doyal (para. #5),
2) The submitted request for state and federal assistance by Judge Craig Doyal to Governor Greg Abbott (para. #5)
3) The presidential declaration for Montgomery County Texas regarding individual assistance (para. #7)

I have enclosed responsive documents and I am returning your postal money order for $15.00.

Sincerely,

James Fredricks

Enclosures



**CRAIG DOYAL**
COUNTY JUDGE
MONTGOMERY COUNTY

501 N. Thompson, Suite 401
Conroe, TX 77301
E-Mail: cojudge@mctx.org

Conroe: (936) 539-7812
Houston: (281) 364-4285
Fax: (936) 760-6919

6-15-15

The Honorable Greg Abbott
Governor of Texas
C/o Chief
Texas Division of Emergency Management
P.O. Box 4087
Austin, Texas 78773-0228

Dear Governor Abbott:

As a result of severe weather that occurred beginning on May 4, 2015, and continuing, Montgomery County is currently facing tremendous physical and economic losses. An estimated nineteen homes homes and/or businesses have major damage, and some families will be in need of temporary housing, and other individual assistance.

It is my belief that the damage to homes, businesses, public works and utility systems due to the severe weather is a public health and safety hazard. I have determined that this incident is of such severity and magnitude that an effective response is beyond Montgomery County's capability to recover without supplementary State and/or Federal assistance. Additionally, I certify that Montgomery County does not have local funding available to make the needed repairs and to provide these citizens with effective relief.

Your assistance in this emergency matter, as it affects the safety and health needs of our citizens would be appreciated.

Sincerely,

Craig Doyal
County Judge

Enclosure:   *Disaster Summary Outline*
             *Local Disaster Proclamation, if issued*



GOVERNOR GREG ABBOTT

June 22, 2015

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
9:30AM O'CLOCK
JUN 22 2015
Secretary of State

The Honorable Carlos Cascos
Secretary of State
State Capitol Room 1E.8
Austin, Texas 78701

Dear Mr. Secretary:

Pursuant to his powers as Governor of the State of Texas, Greg Abbott has issued the following proclamation:

Amending his previous series of proclamations in May certifying that the severe weather, tornado and flooding event that began on May 4, 2015, has now caused a disaster in 110 Texas counties.

The original proclamation is attached to this letter of transmittal.

Respectfully submitted,

Gregory S. Davidson
Executive Clerk to the Governor

GSD/gsd

Attachment

POST OFFICE BOX 12428 AUSTIN, TEXAS 78711 512-463-2000 (VOICE) DIAL 7-1-1 FOR RELAY SERVICES

# PROCLAMATION

BY THE

## Governor of the State of Texas

TO ALL TO WHOM THESE PRESENTS SHALL COME:

I, GREG ABBOTT, Governor of the State of Texas, issued Emergency Disaster Proclamations on May 11, May 15, May 25, May 26, May 29, June 3 and June 18, 2015, certifying that the severe weather, tornado and flooding event that began on May 4, 2015, has caused a disaster in many Texas counties. Disaster conditions persist in many parts of the state.

THEREFORE, in accordance with the authority vested in me by Section 418.014 of the Texas Government Code, I hereby amend the aforementioned proclamations and declare a disaster in Angelina, Archer, Atascosa, Austin, Bastrop, Baylor, Bell, Blanco, Bosque, Bowie, Brazoria, Brazos, Brown, Burleson, Caldwell, Calhoun, Callahan, Cass, Chambers, Cherokee, Clay, Collin, Comal, Comanche, Cooke, Dallas, Delta, Denton, Dewitt, Dickens, Eastland, Edwards, Ellis, Erath, Fannin, Fayette, Fort Bend, Frio, Gaines, Galveston, Garza, Gillespie, Gonzales, Grayson, Grimes, Guadalupe, Harris, Harrison, Hartley, Hays, Henderson, Hidalgo, Hill, Hood, Hopkins, Houston, Jack, Jasper, Johnson, Jones, Kaufman, Kendall, Lamar, Lee, Leon, Liberty, Lubbock, Lynn, Madison, Milam, Montague, Montgomery, Nacogdoches, Navarro, Newton, Nueces, Orange, Palo Pinto, Parker, Polk, Real, Red River, Refugio, Robertson, Rusk, Sabine, San Augustine, San Jacinto, Shelby, Smith, Somervell, Starr, Tarrant, Throckmorton, Travis, Trinity, Tyler, Uvalde, Van Zandt, Victoria, Walker, Waller, Washington, Wharton, Wichita, Williamson, Wilson, Wise, Young and Zavala counties.

Pursuant to Section 418.017 of the code, I authorize the use of all available resources of state government and of political subdivisions that are reasonably necessary to cope with this disaster.

Pursuant to Section 418.016 of the code, any regulatory statute prescribing the procedures for conduct of state business or any order or rule of a state agency that would in any way prevent, hinder or delay necessary action in coping with this disaster shall be suspended upon written approval of the Office of the Governor. However, to the extent that the enforcement of any state statute or administrative rule regarding contracting or procurement would impede any state agency's emergency response that is necessary to protect life or property threatened by this declared disaster, I hereby authorize the suspension of such statutes and rules for the duration of this declared disaster.

In accordance with the statutory requirements, copies of this proclamation shall be filed with the applicable authorities.

IN TESTIMONY WHEREOF, I have hereunto signed my name and have officially caused the Seal of State to be affixed at my office in

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
9:36 A.M. O'CLOCK

JUN 2 2 2015

*Governor Greg Abbott*
June 22, 2015

*Proclamation*
Page 2



the City of Austin, Texas, this the
22th day of June, 2015.

GREG ABBOTT
Governor

ATTESTED BY:

CARLOS CASCOS
Secretary of State

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
9:30 A.M. O'CLOCK
JUN 2 2 2015

TX Notice FLP-1055

## 2   Action

### A   Exceptions for Application Deadlines

County Offices shall thoroughly review Exhibit 1.

### B   Determining Security Values

For the purpose of determining loan security values for loan applications, the beginning date of the incidence period is **May 4, 2015.**

### C   District Director's and Farm Loan Manager's Responsibilities

District Directors and Farm Loan Managers shall follow instructions according to 3-FLP (Rev. 2), and FmHA Instruction 1945-A for emergency loan applicability.

The Farm Loan Manager shall notify borrowers of Disaster Set-Aside (DSA) availability in accordance with handbook 5-FLP paragraph 42.

### D   Public Announcements

Special emphasis will be placed on informing the farm community through public announcements and arranging and conducting meetings with local Agricultural lenders and leaders.

## 3   Contact Point

### A   Inquires

If there are questions concerning this notice, contact the Conservation or Farm Loan Program Division.

TX Notice FLP-1055                                          TX Exhibit 1

Subject:   **Presidential Major Disaster Declaration M4223, Amendment 7**

Please carefully review the notice listing the primary and contiguous counties determined eligible by President Obama and the Emergency Preparedness and Programs Branch for emergency (EM) loans effective **July 9, 2015.**

This declaration is coded **M4223, Amendment 7**, and EM loan applications will be received through **March 9, 2016.**  For the purpose of determining loan security values for loan applications, the beginning date of the incidence period is **May 4, 2015.**

Please proceed to take the appropriate notification and coordination actions required by Handbook 1-DIS and 7CFR part 759.



Posted
~~FILED~~
JUN 1 5 2015
MARK TURNBULL
Clerk, County Court
Montgomery Co., Texas
_(signature)_ Deputy

**CRAIG DOYAL**
COUNTY JUDGE
MONTGOMERY COUNTY

501 N. Thompson, Suite 401
Conroe, TX 77301
E-Mail: cojudge@mctx.org

Conroe: (936) 539-7812
Houston: (281) 364-4285
Fax: (936) 760-6919

## DECLARING A LOCAL STATE OF DISASTER

WHEREAS, the County of Montgomery on the 4th day of May, 2015, and continuing has suffered widespread or severe damage, injury, or loss of life or property resulting from severe weather; and

WHEREAS, the Judge of the County of Montgomery has determined that extraordinary measures must be taken to alleviate the suffering of people and to protect or rehabilitate property;

NOW, THEREFORE, BE IT PROCLAIMED BY THE JUDGE OF THE COUNTY OF MONTGOMERY:

1. That a state of disaster is declared for the County of Montgomery.

2. That the County's Emergency Management Plan has been implemented.

3. That this state of disaster shall continue for a period of not more than seven days of the date hereof, unless the same is continued by consent of the Commissioners Court of the County of Montgomery, Texas.

4. That this proclamation shall take effect immediately from and after its issuance.

ORDERED this the 15th day of June , 2015.

ATTEST: _Mark Turnbull_                    _(signature)_ County Judge
_by Amber Driddy, Deputy Clerk_

# EXHIBIT 6

(TDCAA Newsletter, "To Seize or Not to Seize" authored by Assistant Montgomery County
Attorneys Stuart Hughes and Ronald Chin Seizure")

## Texas District & County Attorneys Association

Published on *Texas District & County Attorneys Association* (http://www.tdcaa.com)

Home > To seize or not to seize … 207 horses

# To seize or not to seize … 207 horses [1]

2015
By Ronald Chin and Stuart Hughes

Assistant County Attorneys in Montgomery County

How does a prosecutor's office seize more than 200 horses that have been neglected and starving for months? Very quickly, it turns out.

Earlier this year, Montgomery County faced a highly unusual case of animal cruelty involving the seizure of more than 200 horses that was hotly contested by the owners. By and large, animal cruelty cases pursuant to the Health and Safety Code tend to be straightforward and often uncontested. But with 200-plus horses at stake, this case was the exception, not the rule.

Herman and Kathleen Hoffman owned 207 horses and, for over a year, had been keeping them confined on just 40 acres. (The rule of thumb is at least one acre per horse if grazing is the primary food source, though supplementing with regular hay and feed can reduce the acreage per horse considerably.)

The horses were confined in pastures resembling a desert with little to no grass to graze on and little to no shelter from the elements. Some of the horses stood in stalls surrounded by their own waste, pine shavings, and dirt pushed up in mounds around them, causing a "fish bowl" effect, which puts pressure on the horses' ankles by standing on uneven surfaces for long periods of time. They were often standing in their own feces. Every one of the horses had overgrown hooves to some degree, and a few horses' hooves were so severely overgrown that they were literally standing and walking on their ankles. Horses were going lame and starving to death, ribs and hip bones were protruding from their bodies, open sores were visible, and rain rot1 was prevalent amongst the herd. (See some photos of the horses below.)

The Hoffmans
The Hoffmans owned a horse ranch called Premium Star, which used the slogan, "Where quality speaks for itself." The business involved breeding and selling American quarterhorses, "descendants of the legendary stallions Poco Tivio and King Fritz."2 By all accounts, if you preferred a quarterhorse from a champion bloodline, you looked no further than Premium Star.

Sometime in 2010, the Hoffmans formed another business called Calico Dairy, a "raw milk to retail" business. In time, the Hoffmans' priority turned to the milk cows, and every last dollar went toward their feed. This dairy, we believe, led to the decline of the horse business.

The investigation

In the fall of 2014, former employees of the Hoffman ranch began to speak out. Claims of neglect, malnourishment, and dying horses surfaced. Local law enforcement was notified and began an investigation. Upon initial encounters at the ranch, law enforcement noticed some underweight horses, but most of the herd appeared healthy. After further encounters, law enforcement noticed a deterioration of body condition amongst the herd. As a result, the Hoffmans received a written notice to comply with the Texas Penal Code, which states, "A person commits an offense if the person intentionally or knowingly fails unreasonably to provide necessary food, water, or care for a livestock animal in the person's custody."3 The notice directed the Hoffmans to seek medical assistance from a veterinarian and to improve the horses' condition. The hope was that the Hoffmans would get their act together, nurse the emaciated horses back to health, and get documentation from a veterinarian about their improved condition. Law enforcement and former employees at the ranch even presented a plan to the horses' owners to sell some of the animals so that they could provide for the rest of the herd. But all attempts at helping the Hoffmans fell on deaf ears.

In June 2015, law enforcement received another call concerning the welfare of the Hoffman horses. Over the months, the horses' conditions had declined significantly, with several needing immediate attention. The next day, our office received a call requesting our attendance at a meeting with the district attorney (among others) regarding allegations of neglect and cruel treatment of these 200 horses.

The issues we faced were numerous. If we went forward with a seizure, would the district attorney seize the horses pursuant to criminal charges, or would the county attorney initiate a civil seizure? If we implemented a civil seizure, would we seize the entire herd or just a handful of the horses in the worse condition? Where would the county put 200 horses if we seized them all? Financially, how would the county care for 200 horses? And how would we prove that every horse was cruelly treated?

The seizure
After a lengthy discussion and the combined efforts of Houston SPCA (Society for the Prevention of Cruelty to Animals), local law enforcement, the district attorney's office, and the county attorney's office, a plan was implemented. The DA obtained a search warrant to enter the Hoffmans' property and look for evidence of cruelty. A representative of the Houston SPCA and a veterinarian, as agents of the state, accompanied law enforcement on the premises and inspected the condition of all the horses. We too went to the Hoffman ranch to see the condition of the horses first-hand. We spent many hours at the ranch over a two-day period speaking with investigators, advising on legal issues, and making mental notes in preparation for the seizure hearing. As prosecuting attorneys, or any advocates for that matter, personal observations of the scene helps us understand the issues and better present our cases.

After consulting with the veterinarian and Houston SPCA, it was determined every horse was being cruelly treated, as defined by §821.021 of the Texas Health and Safety Code, which states the horses have been cruelly treated if they were "unreasonably deprived of necessary food, care, or shelter." Consequently, the decision was made to conduct a civil seizure of all the horses, and Houston SPCA would house and care for them pending final disposition of whether the Hoffmans would be divested of ownership. It was clear that only an outside agency like the Houston SPCA had the resources and expertise to house and care for 200 horses.

Chapter 821 of the Health and Safety Code provides that a peace officer or an officer charged with responsibility for animal control in a county may apply for a warrant to seize a cruelly treated animal in justice court or municipal court.4 Upon a showing of probable cause, the court shall issue a warrant and set the matter for hearing within 10 days.5 The sole issue is whether the horses have been cruelly treated, and if so, the owners shall be divested of ownership.6

We anticipated the need to keep the horses on-site while we attended to their needs so

we asked for (and received) a court order to seize the animals in place. The SPCA vets and workers were at the Hoffman farm for several weeks examining, treating, and ultimately moving each horse in turn. It took an entire two weeks to do this for all 207 horses. From what we were told, SPCA had to seek out volunteers from across the state to do the hard work of managing the horses for the inspections and move them, as well as provide the dozens of trailers and vehicles to physically transport them. It was truly a statewide effort by the SPCA to save these horses.

In addition, all those involved anticipated the costs of caring for theses horses would be expensive. In an effort to help Houston SPCA with costs, the district attorney's office contributed $15,000 toward their care, and the Montgomery County Commissioners Court match-ed that with a $15,000 contribution of its own.

One issue that complicated matters for us was the concurrent criminal investigation. Typically, when there are also criminal charges for abuse, we would seize the animals after the person was convicted of the abuse. However, in this case, we felt that the horses' conditions were so precarious that we needed to act immediately to put them in the SPCA's care to prevent more death and suffering. A few of the horses had to be euthanized; however, most of the horses were treatable and have steadily been nursed back to health. This reality prompted the unusual situation of the animal seizure hearing taking place while the DA's office was still developing criminal charges. Representatives of the DA's office watched our seizure hearings with interest, eager to hear what defenses the Hoffmans would raise for their actions.

The JP trial
At the initial hearing before a justice court, Herman and Kathleen Hoffman represented themselves. They raised several legal challenges to the seizure, primarily concerning the search and seizure warrants. However, a few of their defenses were novel and might have been more effective had the pictures of the horses not undermined their arguments. The Hoffmans tried to argue that they were "mavericks" and "pioneers" in a "new" (old) way of raising and breeding horses that emulated the wild horses that live in the Rockies and western United States. They claimed to be raising wild herds in a natural, "organic" state and argued that it was not fair to judge their horses by standard "beauty" measures set by Hollywood movies, such as Black Beauty and The Black Stallion. They claimed that they were being judged by a society that was judging books by their covers instead of looking past some unkempt manes and unmanicured hooves to see wild, untamed horses. This argument may actually have resonated with some of today's emphasis on organic, free-range, all-natural production on farms and ranches, but the pictures of the pathetic, starved horses in cramped pens with no grass and little to no water undermined the stirring image of wild and healthy horses the Hoffmans intended to evoke. Also, because the Hoffmans argued that their horses were a "wild herd," one would expect a large amount of acreage per horse. The fact that the Hoffmans had each horse on less than one-fifth the recommended acreage severely undermined their argument.

Additional defenses raised by the pro se Hoffmans ranged from highly suspect to downright bizarre. Because the respondents were pro se, we found it necessary to handle such arguments with care, because the court was likely to give non-lawyers a great deal of lenience. (Defendants going pro se is often the case in civil seizures because of the quick statutory time frame to conduct the seizure hearing. However, if they appeal the initial decision, most owners at that point retain an attorney.) This required us to prepare to address each argument, no matter how flawed or meritless each seemed to our legal minds. For example, several of the Hoffmans' arguments relied on statutes and caselaw discussing civil forfeitures related to criminal cases. We found that it was not enough to simply point out that the respondents were citing the wrong law; the court often wanted at least some discussion about why the same principles did not apply to animal seizures. We found it helpful to continually remind the court that this proceeding was entirely civil in nature, with

the burden of proof being preponderance of the evidence. The primary distinction is the purpose of the seizure: We were not seizing the animals to punish an offender for criminal acts or to preserve evidence for a criminal prosecution; rather, the statute we operated under authorized us to seize the animals for their own welfare and to protect them from cruel treatment.

The final big issue the Hoffmans raised was whether the language of the statute allowed for the seizure of a "herd" of animals and whether the seizure warrant was sufficient when it described "approximately 200 horses" at the Hoffmans' farm. The Hoffmans argued that the description was not specific enough and that it should have described the horses by breed, sex, color, etc. We found authority in prior caselaw that the description was sufficient, the standard being that the warrant must be sufficient to allow an officer to seize the correct property and not present a danger of being overbroad.[7] We believe the court found it compelling that the warrant and the officer's testimony established that it was the county's intent to seize all horses found at the farm; therefore, there was no danger of being overbroad.

After an eight-hour hearing, the court found that the Hoffmans cruelly treated all 207 horses, divested them of ownership, and ordered costs incurred by Houston SPCA taxed against the Hoffmans in the amount of $122,254.87.

The appeal

To perfect appeal, the Hoffmans had 10 days to file a notice of appeal and post a bond.[8] Then the statute provides that the county court shall consider the matter de novo within 10 days of receiving the record from the JP court.[9] The case was moving fast.

For the second hearing, the Hoffmans retained an attorney. Interestingly, the attorney presented only a few narrow procedural arguments focusing on the validity of the seizure warrant and did not raise the "wild horses" defense that was so strangely compelling in the first hearing. Perhaps the Hoffmans' arguments would have been different if the second hearing was a jury trial instead of one before the district court judge.[10]

One of the difficult aspects of this case was the statute's swift deadlines. The intent is so that animals are not left in limbo, the owners have the opportunity to get their animals back quickly, and for adequate recovery of impound and care costs incurred during litigation. An issue we were confronted with was whether the county court would lose jurisdiction 10 days after it received the record from the JP court. Is the statute jurisdictional when it says the court shall consider the matter de novo within 10 days? What if the attorney requests discovery or a continuance past the 10 days?

We found two court of appeals cases discussing the issue, and of course, they were contradictory. The Strachan case determined that the county court lost jurisdiction 10 days after it received the clerk's record.[11] However, the court in Brehmer held that the hearing deadlines in the animal cruelty statute were not jurisdictional.[12] Out of an abundance of caution and to bring quick resolution to the case, we pushed for a trial within 10 days. The court granted our request, and the jurisdictional issue was avoided.

At the time this article was written, criminal charges were still pending against the Hoffmans. They each face 21 counts of cruelty to animals, and Hermann Hoffman has been charged with a felony tampering case.

And other than the handful of deaths, most of which occurred shortly after the initial seizure, we are happy to report that the rest of the horses have recovered and some have already been adopted by new forever homes. It is our understanding that it is the SPCA's goal to adopt out all of the horses that they deem suitable for adoption (that will be the majority of them). The remainder, which may be too old, ill, or wild to be adopted, will remain at SPCA facilities under their care.

In conclusion

After a criminal search warrant; a civil seizure warrant; the logistics of housing, caring for,

and transporting 207 horses; and two bench trials—all occurring within 37 days—the Hoffmans were divested of ownership of all 207 horses, Houston SPCA was awarded ownership, and judgment of costs was entered against the owners in the amount of $485,331,68. And now, the Hoffmans have filed a Petition for Writ of Certiorari to the United States Supreme Court. Yes, the United States Supreme Court! So stay tuned: If the care of 200 horses in Montgomery County goes to the highest court in the land, we will tell you all about it.

Endnotes

1 Rain rot, also known as rainscald, is a common skin disease in horses caused by bacteria. Insect bites often spread the disease, which is worsened by moist, warm conditions. Rain rot is easily treated and prevented with good grooming.
2 According to the Premium Star website.
3 Tex Penal Code §42.09(a)(2).
4 Tex. Health & Safety Code §821.022.
5 Id.
6 Tex. Health & Safety Code §821.023.
7 See, generally, Pine v. State, 921 S.W.2d 866 (Houston-14th Dist. 1996) (description of "approximately 15 horses and two head of cattle" sufficient for warrant); Paselk v. State, 2013 WL 6187005 (E. Dist. Tex. 2013) (description of "55 count of Arabian Breed Studs and Mares" was sufficient for warrant).
8 Tex. Health & Safety Code §821.025(b).
9 Tex. Health & Safety Code §821.025(d).
10 Sitting as the County Court at Law.
11 In re Strachan, 2012 WL 1833895 (Tex. App.—Dallas 2012)(mem. op.)
12 In re Brehmer, 428 S.W.3d 920 (Tex. App.—Fort Worth 2014).

| Attachment | Size |
| --- | --- |
| DSC06977.JPG [2] | 613.78 KB |
| DSC06980.JPG [3] | 572.85 KB |
| DSC07009.JPG [4] | 7.24 MB |
| DSC07321.JPG [5] | 628.5 KB |



**Texas District & County Attorneys Association** • 505 W. 12th St., Ste 100 • Austin, TX 78701 • 512-474-2436
Support our work through TDCAF I Website designed by Doug Addison Web Productions
Copyright ©2007-2016 TDCAA. All rights reserved - Ask for rewrite permission. Legal I About I Contact

Source URL: http://www.tdcaa.com/journal/seize-or-not-seize-%E2%80%A6-207-horses-0

Links:
[1] http://www.tdcaa.com/journal/seize-or-not-seize-%E2%80%A6-207-horses-0
[2] http://www.tdcaa.com/sites/default/files/DSC06977.JPG
[3] http://www.tdcaa.com/sites/default/files/DSC06980.JPG
[4] http://www.tdcaa.com/sites/default/files/DSC07009.JPG
[5] http://www.tdcaa.com/sites/default/files/DSC07321.JPG

EXHIBIT 7

(Notes by Chris Smith – Lead Investigator MCDA)

CASE FILE NOTES

CHRIS SMITH
CHIEF INVESTIGATOR
MONTGOMERY COUNTY DISTRICT ATTORNEY

STATE OF TEXAS
V.
HERMAN EDWARD HOFFMAN, JR.
KATHLEEN ELAINA HOFFMAN

15W000008
CRUELTY TO ANIMALS (M-A)

JUNE 23, 2015

9:00 A.M.        On this date at approximately 9:00 A.M., I was approached by Montgomery
County District Attorney Brett Ligon who requested that I accompany him to an unknown
location regarding an unknown matter. Mr. Ligon was accompanied by two females who would
later be identified to me as Hillary Dumas and Shannon Hill. Once on the road, I learned that
we were traveling to a place identified as Calico Farms located on League Line Road in Conroe,
Montgomery County, Texas, in regards to a possible animal cruelty relating to the neglect of
numerous horses. Once on location, Mr. Ligon was able to drive down a county easement
which runs alongside land owned by the defendants in which numerous horses were standing
around. We observed horses that appeared to be in all different degrees of health. Some
seemed stronger than others and some seemed to be very weak and malnourished. Mr. Ligon
was able to take photographs with the use of his cell phone which were later forwarded to me.
These photographs have been printed and are included in this case file for review. After driving
past the open fields, we then approached the front of the property which is best described as
the business office area for Calico Farms. Mr. Ligon and I exited the vehicle while Ms. Dumas
and Ms. Hill remained inside. We initially made contact with Ms. Kathleen Hoffman who was
immediately defensive and resistant to us even being there. After a brief discussion with her
regarding the horses, she summoned her husband, Mr. Herman Hoffman, to come to our
location to continue discussion on this matter. Upon arrival, Mr. Hoffman was also defensive
and proceeded in a very confrontational way of speaking with us. Mr. Hoffman struggled to
stay focused in the conversation as his topics would bounce around from one subject to the
next, all of which relating to how everyone he has ever done business with has done him
wrong. Mrs. Hoffman blamed nature's natural selection on the reason some of the horses were
failing to thrive while others appeared to be in better health. Mr. Hoffman blamed former
employees by stating that they weren't doing their job to feed the animals even though they
were telling him that it had been done. It was very apparent that we were not making any
progress with Mr. Hoffman regarding the neglect of his horses. Mr. Ligon requested that we be

allowed, at our expense, to bring a veterinarian onto the Hoffman property to provide a medical assessment of the horses. Mr. Hoffman stated that he would only agree to this if he approved of the vet prior to bringing one to his land. Mr. Hoffman requested that we contact Dr. Goodman from Navasota to be the veterinarian that we brought to check the horses. The contact number for Dr. Goodman is 936-825-3877. Our conversation was concluded with the Hoffman's at that time. Mr. Ligon and I returned to our vehicle and then departed the location along with Ms. Dumas and Ms. Hill. Mr. Ligon requested that I contact Dr. Goodman immediately to ascertain if he could come to the location of the horses sometime later today.

**11:41 A.M.**    I placed a call to Dr. Goodman's business at which time I was able to speak with unknown office personnel who advised that Dr. Goodman was not currently available but they would get a message to him as soon as possible.

**1:00 P.M.**    I placed a second call to Dr. Goodman's business at which time I was able to speak with unknown office personnel who again advised that Dr. Goodman was not currently available but they would get a message to him as soon as possible.

**1:30 P.M.**    I received a return call on my county issued cell phone from Dr. Goodman at which time I introduced myself to him and explained our dilemma in needing his assistance to come and evaluate the horses belonging to the defendant. Dr. Goodman was immediately reluctant to get involved advising that he was owed a lot of money by the defendant and that he really didn't want to go back over there. I informed Dr. Goodman that we were asking for his assistance in a law enforcement capacity and not on behalf of Mr. Hoffman. I further advised him that we would pay his bill so he would not need to worry about trying to collect from the Hoffman's. When advised that we wanted his assistance on this date, he was quick to inform me that there was no way he would be able to do that due to prior scheduling conflicts. Dr. Goodman stated that he would check his schedule and would get back to me later today and let me know of his decision.

> **NOTE:** During the afternoon hours on this date, I had been contacted by Pct. 5 Deputy Constable Marshall Williams who advised that he had several former employees of the Hoffman's that wanted to meet with us to provide information. I advised Deputy Williams to have the witnesses come to the District Attorney's Office and we would conduct the interviews at that location. The following witnesses arrived at my office in the later afternoon hours on this date:
>
> Vicki Henley
> Cassandra Dicken
> Christal Ray     AKA: Christal Griffiths
> Kayla Kidd
> Bridgette Monnich
> Ashley Coker

The following information is a brief summary based on the interviews of the above listed witnesses:

**3:13 P.M.**      Interview with Vicki Marie Henley      DOB: 03-31-1977      Cell: 409-719-1778
Ms. Henley stated that she was a volunteer at the Hoffman's business from approximately October 2014 through March 2015. During this time period, Ms. Henley served as the Operations Manager. According to Ms. Henley, Mr. Hoffman regulated what was fed to the horses based on what type of food he had or the quantity that was available. Regardless, the dairy cows were always the number one priority for Mr. Hoffman. Ms. Henley believes the lack of food began occurring in January 2015. It is also her recollection that there was a lack of food for the horses at least a dozen times. Ms. Henley stated that she has known the Hoffman's since around 2006 or 2007. During the time period Ms. Henley was a volunteer for the Hoffman's, she can recall four horses, two cows and four or five goats that died. Ms. Henley only remembered seeing a veterinarian on the Hoffman property one time and that they were there only to check the cows. Ms. Henley stated that she believes the last horse died in February 2015. A voluntary written statement consisting of five pages was completed by Ms. Henley and was provided to this investigator. A copy is included in this case file for review.

**3:57 P.M.**      Interview with Cassandra Dicken      DOB: 03-08-1996      Cell: 832-683-9142
Ms. Dicken advised that she worked for the Hoffman's from February 20, 2015 through June 20, 2015. Ms. Dicken was initially hired to work in the store but eventually was tasked with feeding the horses. According to Ms. Dicken, she and Ms. Bridgette Monnich were the only ones whose job was to feed. Their work schedule had them assigned to opposite days of each other and then they both worked on Saturday. Ms. Dicken stated that she would feed the horses "cubes" at the direction of Mr. Hoffman even though "cubes" weren't for the horses. Between February and June 2015, Ms. Dicken recalls approximately 25 horses dying on the Hoffman property. Of those horses that died, all were burned on the property except five that were carried to the landfill. Ms. Dicken was never paid properly by the Hoffman's and is still owed money. A voluntary written statement consisting of five pages was completed by Ms. Dicken and was provided to this investigator. A copy is included in this case file for review.

**4:27 P.M.**      I received a call on my county issued cell phone from the office of Dr. Goodman advising that he was booked for now and would not be able to assist us. This information was referred to District Attorney Ligon.

**5:14 P.M.**      Interview with Christal Ray      DOB: 07-05-1984      Cell: 936-522-7813
Ms. Ray advised that she also goes by the name of Christal Griffiths and that she operates a private rescue by the name of Christal Creek Ranch which is located on FM 1314 and Old Humble Pipeline in Conroe, Montgomery County, Texas. Ms. Ray stated that she has never been on the Hoffman property. Ms. Ray does know Ms. Kayla Kidd who once worked at Tractor Supply and later worked for the Hoffman's. Ms. Dicken brought a colt to Ms. Ray for assistance. I believe this occurred on or about June 20, 2015. Ms. Ray attempted to provide care for the colt but quickly realized that she needed additional assistance. Ms. Ray transported the colt to the Brazos Valley Equine Hospital on or about June 21, 2015. The colt began receiving

veterinarian care but subsequently died on the same date.  Ms. Ray provided, via email, a copy of photos of the colt along with a one page report from the Brazos Valley Equine Hospital. These documents are included in this case file for review.  Ms. Ray also provided this investigator with a voluntary written statement consisting of two pages.  A copy is included in this case file for review.

**6:04 PM**     Interview with Kayla Kidd          DOB: 10-09-1993     Cell: 936-217-0570
Ms. Kidd stated that she worked for the Hoffman's from March 2015 through June 20, 2015. While employed with the Hoffman's, Ms. Kidd's job title was Head Milker and that her only job was to milk the dairy cows. According to Ms. Kidd, Mr. Hoffman did not care about the horses and that his number one priority was the cows. Ms. Kidd was never paid properly by the Hoffman's and is still owed money. Ms. Kidd believes that about 30 horses died during the three months she was employed by the Hoffman's. Ms. Kidd emailed several photos to me of horses that were both dead and alive. I have included the email and photographs in this case file for review. Ms. Kidd does not believe that the Hoffman are bad people but does feel that they are overwhelmed and unable to take care of that many horses. Ms. Kidd provided a rough sketch of the property and identified the specific area where the burn pile is located. This document is included in the case file for review. A voluntary written statement consisting of three pages was completed by Ms. Kidd and was provided to this investigator. A copy is included in this case file for review.

**6:49 P.M.**     Interview with Bridgette Monnich     DOB: 09-09-1996     Cell: 832-260-1930
Ms. Monnich advised that she worked for the Hoffman's from December 2014 through June 1, 2015. Ms. Henley, previously interviewed, is her step-mother and was able to get her the job. Her pay was to be $8 - $9 per hour but she was never paid on a regular basis. Ms. Monnich stated that she was hired to do all tasks but mainly she just fed the animals. She also did some grooming of the horses and milked the cows. Ms. Monnich, as with other witnesses, emphasized that the Hoffman's priority was on the dairy cows and definitely not the horses. Ms. Monnich reported seeing between 15-20 dead horses during the time she spent at the Hoffman's. Ms. Monnich emailed photos of dead horses to my county assigned email address. I have printed and included said photos in this case file for review. According to Ms. Monnich, there were several days that the horses went without being fed anything. The Hoffman's were not paying Ms. Monnich her earned wages which is ultimately why she left. A voluntary written statement consisting of four pages was completed by Ms. Monnich and was provided to this investigator. A copy is included in this case file for review.

**7:23 P.M.**     Interview with Ashley Coker          DOB: 02-02-1994     Cell: 936-788-4547
Ms. Coker advised that she was a former manager at Tractor Supply and that's how she came to know the Hoffman's as they were a customer of that business. Ms. Coker worked for the Hoffman's for a brief period of time beginning on or about June 1, 2015 and ending on June 20, 2015. Ms. Coker stated that she was initially hired to assist with milking the cows but ended up doing pretty much everything. Within the time period of her employment with the Hoffman's, Ms. Coker stated that she witnessed approximately 15 dead horses and two dead cows. We discussed how Mr. Hoffman would direct her to give good hay to certain animals and bad hay

to others.  She advised us about one horse that was in bad shape that basically baked to death in the heat of the sun.  Ms. Coker stated that she asked Mr. Hoffman to get the horse some much needed assistance but was told to just leave the horse alone.  She attempted to give the horse water and was again told by Mr. Hoffman to leave the horse alone.  A voluntary written statement consisting of two pages was completed by Ms. Coker and was provided to this investigator.  A copy is included in this case file for review.

**9:00 P.M.**       I and Pct. 5 Deputy Constable Marshall Williams returned to the Hoffman's place of business located at 10066 League Line Road.  Upon arrival, we met with the Hoffman's in the office of their store location.  We began discussing, as in previous conversations, the issue of the neglected conditions of the horses.  The longer we spoke with Mr. and Mrs. Hoffman the more irate and agitated they became.  Mr. Hoffman at different times was yelling and screaming at us stating that "we didn't know what we were about to get in to".  When referring to the type of media attention this investigation was going to create, Mr. Hoffman made the following statement, "This is going to be bigger than that nigger that beat his kid".  It is my assumption that he was referring to the criminal matter involving NFL player Adrian Peterson. Mr. Hoffman continuously ridiculed us accusing us of bowing to social media and only looking out for ourselves.  He further stated that he knew all we wanted was to take his horses because they were worth a lot of money to someone.  At one point, Mr. Hoffman got on his cell phone and placed a call to someone demanding that they come get the horses immediately and remove them off the property.  I immediately made telephone notification to District Attorney Brett Ligon who advised that we would not physically be able to keep Mr. Hoffman from removing the horses but that it would be in his best interest for that to not occur.  Mr. Hoffman stated that some of the horses were not his and that he was only housing them as some sort of "partnership".  I advised Mr. Hoffman that this was a criminal investigation and that we would be back to his property tomorrow morning and that we would expect to find everything in the same condition as it is when we leave tonight.  Mr. Hoffman began arguing with us regarding the time that we would be showing up on the morning of the 24th as he had a court hearing that he was required to attend at 9:00 A.M.  I asked Mr. Hoffman who the attorney was regarding that matter and he informed me of Chris Beck.  I then placed a call to Mr. Beck who informed me that Mr. Hoffman was not required to attend the hearing and that the only reason he wanted to go was to request that new counsel be appointed to his matter.  Mr. Beck further advised that he had previously filed a motion to withdraw as counsel for Mr. Hoffman and that he wished Mr. Hoffman the best of luck going forward.  I discussed this conversation with Mr. Hoffman who again stated that he was going to attend the hearing at 9:00 A.M. tomorrow morning and that we needed to wait until he was back home before we returned to his property.  During our conversation with Mr. Hoffman, he assigned blame to his former employees for not properly taking care of the horses.  Mr. Hoffman stated that he paid certain people to feed the animals and he simply took them at their word if they said they had done so. At no time did Mr. Hoffman ever take any level of responsibility for the neglect of the horses. Mr. Hoffman was strongly encouraged by Deputy Williams to provide us with a voluntary written statement.  Deputy Williams reminded Mr. Hoffman that he has been trying to get him to do the statement for quite some time now but Mr. Hoffman continues to neglect getting it

done.  Upon determining that our conversation with the Hoffman's was futile in effort, we then departed the location.

> **NOTE:** During our conversation with the Hoffman's, a young unidentified white female was also on location.  At no time during our discussion did this individual offer any verbal input regarding the issue of the horses.  Upon leaving the Hoffman's, Deputy Williams and I traveled to the store located at the Northwest corner of League Line Road and I-45 South.  While at this location, we were approached by the same female who was then identified as Kristen Hatch.  Ms. Hatch stated that she is a current employee of the Hoffman's and that she works the front counter of their store where they sell milk and other product.  Ms. Hatch only wanted to advise us that she doesn't believe the Hoffman's are bad people but does believe that they are in over their heads and are just unable to take care of the horses.  Ms. Hatch stated that she is friends with several of the witnesses who are previously listed in this report.  She wanted us to know that there were times when she felt that the other employees (listed above) weren't doing their job when it came to always feeding the horses.  Ms. Hatch had no further information to provide at this time.  She provided a contact number for her cell phone as 281-734-1039 and advised that she would be available if we needed to speak with her further regarding this issue.

**JUNE 24, 2015**

**12:00 A.M.**    I received a text message on my county issued cell phone from Ms. Kayla Kidd who advised that she had received information that there were cattle trailers going in and out of the Hoffman property and she was concerned that horses or animals were being removed off the property.  I immediately forwarded this information to Deputy Williams who responded by saying that he would check and see what was going on.  I was again contacted by Deputy Williams later in the night (morning) who informed me that he had followed a truck pulling a trailer carrying approximately four to five horses that had just left the Hoffman property. Please refer to the written report of Deputy Constable Marshall Williams regarding this matter and his interaction with the subject driving the truck.

**7:00 A.M.**    I along with District Attorney Brett Ligon traveled to the Hoffman property located at 10066 League Line Rd.  After driving down the county easement and again viewing the horses that were roaming in the dirt field, Mr. Ligon and I approached the business area of the Hoffman property at which time I exited our vehicle and began speaking with Mr. Hoffman. I advised Mr. Hoffman again that this was an ongoing investigation and that no further horses should be removed from his property.  Mr. Ligon then exited the vehicle and approached us to reiterate to Mr. Hoffman what I had just advised him.  Mr. Hoffman was again verbally aggressive towards both Mr. Ligon and I.  We then departed from the Hoffman property and Mr. Ligon returned me to my vehicle which was parked at a business located on League Line Rd. I then made telephone contact with Deputy Williams who informed me that the person who took the horses from the Hoffman property during the early morning hours on this date was

Mr. Buddy Maybin and that he lives at 15920 Tree Monkey Road in Conroe, Montgomery County, Texas.

**7:30 A.M.**      I traveled to 15920 Tree Monkey Road at which time I made contact with Mr. Buddy Maybin who appeared to be very cooperative regarding this matter.  According to Mr. Maybin, he was contacted last night by Mr. Herman Hoffman who demanded that Mr. Maybin immediately drive to his property located on League Line Road to remove several horses.  Mr. Maybin stated that the horses were given to him by Mr. Hoffman to settle a debt Mr. Hoffman owed to Mr. Maybin regarding quite a bit of work that Mr. Maybin had completed for the Hoffman's but had never been financially compensated for.  Mr. Maybin directed me to the five horses he removed from the Hoffman's earlier this morning.  Two of the horses, which Mr. Maybin informed me possibly belonged to another individual, appeared to be in fair condition while the other three horses which Mr. Maybin stated were given to him appeared to not be doing quite as well.  I took photographs with my county issued cell phone and later emailed the listed photographs to my county email address.  These photographs were later printed and are included in this case file for review.  Mr. Maybin stated that he was supposed to return to the Hoffman's to retrieve four additional horses which were also being given to him.  He stated that he had decided against that as he did not want to get any more involved in this matter than he already was.  I advised Mr. Maybin that we would leave the horses at his location temporarily until other arrangements could be made and that he was not to move nor dispose of any of these animals for any reason whatsoever.  Mr. Maybin agreed and wanted to make sure I understood that he is not a fan of the Hoffman's and wants nothing to do with them.  I left a voluntary written statement form with him and requested that he complete it at his convenience.  Mr. Maybin's contact number on his cell phone is 936-524-1366.  I then departed the Maybin residence and returned to my office.

**9:00 A.M.**      I attended a meeting being held in Mr. Brett Ligon's office which was being used to bring our office, the office of the Montgomery County Attorney, the Houston SPCA, and local elected officials up to date on where we stood and what our goal and objective was.  During this time period, Deputy Williams was preparing a search warrant for the Hoffman property.  A copy of said search warrant is included in this case file for review.

**2:20 P.M.**      The following Montgomery County District Attorney Investigators and personnel arrived on location at 10066 League Line Road in execution of a search warrant:

| | |
|---|---|
| Unit #9209 | Chief Investigator Chris Smith |
| Unit #9204 | Investigator Joey Ashton |
| Unit #9211 | Investigator Rico Cano |
| Unit #9208 | Investigator Gale Echols |
| Unit #9259 | Investigator Dennis Ward |
| Unit #9213 | Investigator Larry Melton |
| Unit #9210 | Investigator Erin Smith |
| Unit #9200 | District Attorney Brett Ligon |

Assistant District Attorney Mike Holley
Assistant District Attorney Nicole Czajkoski

When all units initially arrived on scene, I and Deputy Williams made contact with the Hoffman's at which time we provided them with a copy of the search warrant. Mr. Hoffman was immediately checked for weapons due to officers having prior knowledge of his possession of at least one firearm. No weapons were found on his person. Mr. and Mrs. Hoffman were then provided chairs and asked to remain on the porch of their business in the shaded area so as to stay cool and so that all law enforcement personnel on scene could complete the execution of the search warrant with little or no conflict from the Hoffman's. As the day progressed, Mr. and Mrs. Hoffman were afforded the opportunity to be seated in their air conditioned office but refused the offer. They were also provided with cold water and food as it was delivered to our location. In the later afternoon hours, the Hoffman's were allowed to feed their animals, excluding the horses, and their employee was allowed to return to the property to assist with milking the dairy cows. The search warrant was executed in the manner as outlined in the document in regards to the items being searched for. It was later determined, while still on scene, that we would seek an arrest warrant for Mr. Herman Hoffman and Ms. Kathleen Hoffman for the offense of animal cruelty (3 counts). Deputy Williams traveled to the office of the District Attorney at which time he met with Assistant District Attorney Mike Shirley who assisted in the preparation of these documents. Once the arrest warrants were signed by a judge and active, Deputy Williams returned to the Hoffman property to execute same. Prior to execution of the arrest warrants, Mr. and Mrs. Hoffman were provided with a written inventory of the items that were being removed from their property as a result of the search warrant. Mr. Hoffman began complaining of chest pains, for the second time this evening, and was subsequently transported to the Conroe Regional Medical Center Hospital for testing. Ms. Hoffman became very aggressive when we attempted to detain her and prevent her from getting to her husband. She was ultimately taken into custody and transported to the Montgomery County Jail for completion of the booking process.

NOTE: Please refer to the written report of Deputy Constable Marshall Williams which will outline the procurement of the search warrant and subsequent arrest warrants for the Hoffman's along with any additional information regarding his actions during this investigation. Deputy Williams report should also cover the information regarding the civil seizure of the Hoffman horses and the scope of them being seized in place with care being rendered by the Houston SPCA.

NOTE: All Montgomery County District Attorney Investigators have provided written supplements regarding their actions on this date. These supplemental reports are included in this case file for review. Any audio or visual documentation completed by D.A. Investigators has been placed on disk(s) and is also included in this case file for review.

All District Attorney Personnel cleared the location identified as 10066 League Line Road at approximately 10:27 P.M.

JUNE 25, 2015

On this date, I was at the Montgomery County Sheriff's Office Firearms Training Facility attending a rifle training class. In the evening hours on this date, I did have a telephone conversation with Mr. Buddy Maybin who wanted to know the status of the horses that were in his possession. After speaking with District Attorney Brett Ligon, it was decided that the five horses in question would be temporarily left in the custody of Mr. Maybin and that he would be allowed to seek treatment for them as needed. This information was relayed to Mr. Maybin. During my telephone conversation with Mr. Maybin, he informed me that he was in possession of a Bill of Sale regarding the five horses in his possession as well as four additional horses that were still being housed on the Hoffman property. Based on the way Mr. Maybin presented the information to me, it was my impression that he had been in possession of the Bill of Sale for a period of time prior to now. I requested a follow-up interview with Mr. Maybin who informed me that he was leaving to go out of town tomorrow morning (06-26-2015) but that he would be returning on Monday (06-29-2015) and would be available to meet with me on that date. My conversation with Mr. Maybin was concluded at that time.


JUNE 26, 2015

8:53 A.M.      I received a call on my county issued cell phone from Ms. JJ Hill who wanted to advise me that on 06-25-2015, in the late afternoon or evening hours, she was parked in the church parking lot located on League Line Road in the vicinity of the driveway belonging to the defendant. Ms. Hill's daughter was in the vehicle with her and her friend, Rhianna, was standing just outside of Ms. Hill's vehicle while the two of them were having a conversation. Ms. Hill observed the defendant's vehicle approaching them at what she described as a high rate of speed. According to Ms. Hill, Rhianna became frightened and jumped back into her own vehicle. During this incident, the defendant appeared to be yelling and flailing his arms about while still inside his vehicle. Ms. Hill could not hear what the defendant was saying during this altercation. If I understood her correctly, Ms. Hill advised that she attempted to leave the church parking lot area and at the same time the defendant attempted to block League Line Road with his truck. Ms. Hill had to evasively drive around the defendant's vehicle so that she could get to her house. Upon arriving at her residence, Ms. Hill informed her boyfriend and father of what had just occurred. The two men then drove to the residence of the defendant and confronted him about the recent incident and strongly advised the defendant to stay away from their family. The conversation with Ms. Hill was concluded at this time. Ms. Hill's contact number is 936-443-1717.

9:22 A.M.      I placed a telephone call to Ms. JJ Hill and advised her that I would like to obtain a voluntary written statement from her and the other witnesses regarding the previously mentioned incident with the defendant on 06-25-2015. We agreed that Ms. Hill would come to

my office on this date and would be provided with blank voluntary written statements that she could deliver to the other witnesses and that she could complete in a manner that was conducive with her schedule.

**9:31 A.M.**     I placed a telephone call to the cell phone of Pct. 5 Deputy Constable Marshall Williams.  Upon making contact, Deputy Williams provided me with the contact number for Pct. 5 Deputy Constable Gordon Welch and also for Herman and Kathleen Hoffman.  The contact information is as follows:

| | |
|---|---|
| Deputy Welch: | 281-541-6121 |
| Herman Hoffman | 936-523-0610 |
| Kathleen Hoffman | 936-524-2164 |

Deputy Williams also advised that he was in possession of my work product regarding this investigation which I had left in his vehicle on 06-24-2015.  Deputy Williams stated that he would come by my office today and deliver this documentation to me.  The conversation with Deputy Williams was then concluded.

**9:44 A.M.**     I received a call on my office phone from County Attorney Investigator Randy Lewis who advised me that Assistant County Attorney Stuart Hughes was in need of the witness information in my possession regarding the former employees of Calico Farms who were previously interviewed on the night of 06-23-2015 in my office.  I advised Investigator Lewis that I was waiting on Deputy Williams to return that information to me and that I would call him back as soon as it was in my possession.

**9:45 A.M.**     I placed a call to the cell phone of Pct. 5 Deputy Constable Gordon Welch at which time I requested information from him regarding the Moss Hill location.  Deputy Welch stated that Sgt. Sprayberry is the livestock deputy for the Liberty County Sheriff's Office and that he had been to the Moss Hill location on numerous occasions.  The contact number for Sgt. Sprayberry is 281-615-2669

**9:55 A.M.**     I received a call on my county issued cell phone from ADA Lora Ciborowski who advised me that she was in the process of working on the conditions of bond regarding both defendants.  ADA Ciborowski wanted to know if we would be able to hand deliver this document to the defendants once signed by a Judge.  I advised her that would be no problem at all and to just let me know when they were ready and that I would deliver them myself.  The conversation with ADA Ciborowski was then concluded.

**10:10 A.M.**     Pct. 5 Deputy Constable Marshall Williams arrived at my office and provided me with the documentation I had previously left in his vehicle.  Due to Deputy Williams being off-duty, we only briefly spoke about the investigation before he departed my location.

**10:30 A.M.**     JJ Hill arrives at my office.  Upon speaking with her, I provided Ms. Hill with multiple blank voluntary written statement forms which she had previously agreed to deliver

and complete for me. I provided Ms. Hill with two blank forms for herself so that she could complete one regarding the altercation with Mr. Hoffman on 06-25-2015 and a second so that she could provide information regarding her knowledge of the Hoffman's and their care, or lack thereof, of the horses. Ms. Hill agreed and then departed from my location.

**10:35 A.M.**     ACA Stuart Hughes and Investigator Randy Lewis arrived at my office at which time I provided with them with copies of the witness statements I had previously obtained on 06-23-2015 along with photographs of injured, neglected, and dead horses which had been provided to me during the course of this investigation. I then directed D.A. Investigator Erin Smith to assist both Hughes and Lewis in the review of some of the documents which had been collected from the Hoffman property during the execution of the search warrant on Wednesday, 06-24-2015.

**11:30 A.M.**     I escorted ADA Mike Holley and ADA Lora Ciborowski to the Hoffman property aka Calico Farms. Upon arrival, Mr. Holley and I met with both Herman and Kathleen Hoffman at which time I personally served them both with the ancillary conditions of bond documents which had been signed by County Court at Law #1 Judge Dennis Watson.

    Note:   The specific conditions of importance are as follows:

-   Herman and Kathleen Hoffman are not permitted to interfere with the duties of any law enforcement personnel on scene.
-   Herman and Kathleen Hoffman are not permitted to interfere with the duties of the Houston SPCA or their representatives.
-   Herman and Kathleen Hoffman are not to have any contact or interaction with any horse on their property.
-   Herman and Kathleen Hoffman are to remain inside their residence between the hours of 10:00 P.M. – 6:00 A.M.

Mr. Hoffman was again verbally aggressive towards DA personnel and continued to blame us for his problems. Upon conclusion of this matter, I then escorted both Holley and Ciborowski to the large barn area located on Hoffman's property so that we might be able to speak with the representatives from the Houston SPCA. Upon arrival at the barn, I was also able to speak with Pct. 4 Deputy Constable D. Smith and MCSO Jail Deputy J. Park. Deputy Smith provided me with the name of Earl Sample and a contact number of 713-882-2677. According to Deputy Smith, Mr. Sample is a former Ranch Manager for the Hoffman property and might possibly have information relevant to our case. Deputy Smith advised that through his conversation with Mr. Sample, he learned that there was an office/storage area in the barn that was locked and possibly contained narcotics that are used to kill horses. I advised Deputy Smith that I would follow-up with Mr. Sample today to discuss this matter with him. Deputy Park was on location to supervise the MCSO jail inmates (trustees) which were there to assist in cleaning out the horse stalls within the big barn. I had previously learned from District Attorney Brett Ligon that both Deputy Park and Deputy Woodrick had, at different times, been on location for this manner of supervision. I advised Deputy Park that he and Deputy Woodrick would potentially

be called as witnesses to testify in regards to the condition of the stalls that the inmates were there to clean out. All D.A. personnel then departed from the Hoffman property.

**1:19 P.M.**      I sent an email to D.A. ICAC Investigator Nikki Neeley regarding my request for her to complete a preservation letter to the appropriate cellular carrier for the Hoffman's cell phones to be able to retain any possible text messaging. A copy of said email is included with the case file for review.

**1:25 P.M.**      I placed a call to Liberty County S.O. Sgt. Sprayberry at 281-615-2669. Upon making contact, I advised Sgt. Sprayberry that I was inquiring about his knowledge pertaining to the Moss Hill location. Sgt. Sprayberry stated that he was at the Moss Hill location on 06-25-2015 and that he drove most of the property at the request of Deputy Smith with the Montgomery County Pct. 4 Constable's Office. Sgt. Sprayberry advised that he did not see any new carcasses or dumping sights on the property but that there are animal bones (believed to be horses) scattered about. These bones have been there for some time and are not new to the property. Sgt. Sprayberry stated that he has known of Mr. Hoffman from back in July 2014 when Hoffman was leasing the Moss Hill property to keep horses on it. There were complaints during that time period of neglect to the animals which is ultimately what caused the property owner to cancel the lease and evict Mr. Hoffman and his horses off the land. Sgt. Sprayberry stated that the Houston SPCA was involved in that investigation too. There are now new property owners at this location and they were currently bailing hay on the land. They too advised Sgt. Sprayberry that they had not seen anyone or anything on the property that shouldn't be there. I requested that Sgt. Sprayberry provide me with the contact information for both the former and current owners of the Moss Hill property. Sgt. Sprayberry stated that he was off-duty on this date and that he would be back at work on Tuesday, 06-30-2015, and that he would email me the requested information at that time. Upon conclusion of the call with Sgt. Sprayberry, I then sent him an email to james.sprayberry@co.liberty.tx.us confirming my request for the information. I have included a copy of said email in this case file for review.

**1:47 P.M.**      I placed a telephone call to Dr. Benjamin Buchanan with the Brazos Valley Equine Hospital at 936-825-2197. Upon making contact with Dr. Buchanan, I advised him that I needed to obtain a copy of any and all records relating to the treatment of a colt identified by the name of "Tequila" which was seen at his facility on 06-21-2015 and subsequently died. Dr. Buchanan was very cooperative but did request that I send him a Grand Jury subpoena regarding the information I was in need of. Dr. Buchanan further stated that he would email the documents to me and that I could forward the subpoena to him via fax # 936-825-6794 once it was ready. I advised Dr. Buchanan that I appreciated his assistance and that I would be back in touch with him at a later time. I then emailed a request to Mary Osborn asking that she prepare the Out of County Grand Jury subpoena for Dr. Buchanan. Ms. Osborn advised that she would take care of this matter and that the subpoena would probably be ready to be served on Monday, 06-29-2015. I then placed a second call to Dr. Buchanan at which time I advised him of this information.

**2:23 P.M.**      I placed a telephone call to 281-889-8468 but was unable to make contact and was advised that the mail box was not available for messages. It was my understanding that this number belonged to a female who had left a message earlier this date at the District Attorney's Office and that she might possibly have information regarding the Moss Hill location and that she might also possibly be a former employee of the Hoffman's.

**2:30 P.M.**      I placed a second call to the 281-889-8468 number and again was unable to make contact or leave a voice message.

**2:35 P.M.**      I received an email from D.A. ICAC Investigator Neeley advising that the numbers I had provided to her earlier this date were land line numbers. Due to this making no sense to me, I placed a call to Mr. Buddy Maybin to verify that I had the correct numbers. I was able to leave a voice message for Mr. Maybin requesting that he return my call. A copy of the email communication between Investigator Neeley and I is included in this case file for review.

**3:15 P.M.**      I received a call on my county issued cell phone from Mr. Buddy Maybin who was able to verify that the numbers I had listed for the Hoffman's were in fact their cell phone numbers. Mr. Maybin also wanted to advise me that Mr. Hoffman has been calling his phone all morning but that he hasn't taken any of the calls. I advised Mr. Maybin to handle that as he saw fit. I then emailed Investigator Neeley the information provided by Mr. Maybin regarding the cell numbers being accurate. I have included a copy of this email in the case file for review.

**3:30 P.M.**      Mr. Buddy Maybin called my county issued cell phone advising that Mr. Hoffman had left a message on his cell phone advising that he wanted to get with Buddy regarding the five horses that Buddy was currently in possession of. I advised Buddy to ignore the call but to save the message on his phone and that I would listen to it when he comes by my office on Monday (unknown time) for our meeting.

**4:05 P.M.**      I received an email from Investigator Neeley advising that she is in the process of completing a preservation letter for Verizon regarding the text messages of the Hoffman's. I have included a copy of said email in this case file for review.

>      **NOTE:** The preservation letter needs to be followed-up on Monday, 06-29-2015, with a search warrant.

**4:45 P.M.**      I placed a telephone call to Pct. 4 Deputy Constable D. Smith to verify the information he had previously provided me regarding Mr. Earl Sample.

**5:01 P.M.**      I placed a telephone call to Mr. Earl Sample at 713-882-2677. Upon making contact with Mr. Sample, I identified myself to him and advised him that I had been given information that he might have something to inform us about regarding the Hoffman's. Mr. Sample stated that he was the Ranch Manager for the Hoffman's in 2009 and that he's had no contact with them since around 2010. During his time as manager, Mr. Sample stated that the horses were very well taken care of and were in very good condition. He further stated that he was quite shocked to learn of the current condition of the animals as this was definitely out of

the norm.  Mr. Sample did verify that when he was Ranch Manager in 2009, the Hoffman's would keep different types of drugs locked in the room in the large barn.  One of the drugs was specifically designed to kill horses.  He was unable to remember the name of the drug.  He did recall that Kathleen Hoffman would order these drugs online and would sometimes tell the company that she never received the package when in fact she had so that she would be sent additional drugs at no charge.  Mr. Sample had no additional information and nothing relevant to the current neglect of the animals.  The conversation with Mr. Sample was then concluded.

**5:30 P.M.**     I placed a third call to 281-889-8468 at which time I was able to make contact with Ms. Lacy Witt.  Ms. Witt informed me that she worked for the Hoffman's for about 6-9 months from 2007-2008.  Ms. Witt stated that during the time period she was employed by the Hoffman's that the animals were in very good condition and well taken care of.  Ms. Witt had no information regarding the current neglect of the animals.

**5:42 P.M.**     Earlier this date, a voice message from a "Melissa" at 936-900-5184 was left for First Assistant District Attorney Phil Grant on his voicemail.  This message was forwarded to me by Mr. Grant for a return call to be made.  I did place a call to this number but was only able to leave a voice message.

**JUNE 27, 2015**

**12:33 P.M.**     I received a text message on my county issued cell phone from Buddy Maybin advising that he had received a text message from Mr. Hoffman stating that he was going to Buddy's house to see the five horses that Buddy currently has in his possession.  I advised Buddy via text message that he needed to inform Mr. Hoffman that he was not welcome at Buddy's property.  Buddy advised via text message that he would do so.

**JUNE 29, 2015**

**9:00 A.M.**     Deputy Williams arrived at my office at which time I advised him that I needed him to draft a search warrant to Verizon Wireless  which was required subsequent to the preservation letter which Investigator Neeley sent them on 06-26-2015.  We initially met with ADA Lee Romero who informed us that we really needed to be working on this with either ADA Mike Holley or ADA Lora Ciborowski as they would be the one preparing the warrant.  I had ADA Romero email me the template for the search warrant which I later forwarded to ADA Ciborowski for review.  Due to ADA Holley and ADA Ciborowski being unavailable at the present moment, Deputy Williams departed my office and returned to 10066 Leage Line Road to check on the status of things at that location.

**9:35 A.M.**     I received an email from Mary Osborn advising that the Grand Jury subpoena for the Navasota Equine Hospital had been completed and forwarded to ADA Ciborowski for

service. ADA Ciborowski was able to verify that this subpoena had been faxed to the Navasota Equine Hospital.

**11:00 A.M.**   Christal Ray (AKA: Christal Griffiths) and Kayla Kidd arrived unexpectedly at the District Attorney's Office. Christal was very upset at the negative publicity and threats she had been receiving in social media from unknown people who she believes were responding to a posting made by a local media source identified as Scott Engle. I informed Ms. Ray that any issue she had with Mr. Engle was something she needed to deal directly with him on. I then escorted Ms. Kidd to my office at which time I asked her about the office area located in the big barn. Ms. Kidd stated that she was never allowed in the office and that Mr. Hoffman always kept it locked. According to Ms. Kidd, Mr. Hoffman told her that there were rats inside the office and that she didn't need to go in there. During my conversation with Ms. Kidd, she informed me that they had just come from the County Attorney's Office. I asked her if Ms. Dicken was with her and she said that she was and that Ms. Dicken was still at the County Attorney's Office. I then requested that Ms. Kidd inform Ms. Dicken to come to my office at her earliest convenience.

**11:59 A.M.**   Ms. Dicken arrived at my office at which time I asked her the same question regarding whether or not she had ever been inside the office located in the big barn. Ms. Dicken too stated that she had never been inside that specific office.

**12:45 P.M.**   Deputy Williams returned to my office at which time I connected he and ADA Ciborowski for the purpose of drafting the search warrant for Verizon Wireless. A copy of said search warrant is included in this case file for review.

> **NOTE:** Please refer to the report completed by Pct. 5 Deputy Constable Marshall Williams which will outline the information regarding the drafting and execution of the search warrant to Verizon Wireless.

**2:00 P.M.**   **(Approximate)**   I along with ADA M. Holley and ADA K. Blackburn met with Mr. Buddy Maybin at his residence located at 15920 Tree Monkey Road for the purpose of conducting an interview with him. The interview was audio recorded and a copy of the recording has been included in this case file for review.

**4:51 P.M.**   I received an email from the Navasota Equine Hospital with an attachment that contained a two page report. This report was sent in response to the Grand Jury subpoena that had been faxed to them earlier this date. I have printed both the email and the report and have included same in this case file for review.

JUNE 30, 2015

**9:19 A.M.**   I received an email from District Attorney Environmental Investigator Dennis Ward that contained an attachment of a TCEQ document regarding a prior but recent environmental investigation that occurred on the Hoffman property located at 10066 League

Line Road.  The report provided specific information regarding the large mass of horse manure which was stacked on Mr. Hoffman's land.  Based on my review of the report and by an act of nature, it appears to me that there is no environmental issue regarding said manure pile.  I have printed both the email and the TCEQ report and have included same in this case file for review.

**10:30 A.M.**    I placed a telephone call from my office phone to Ms. Kristen Hatch at 281-734-1039.  Upon making contact, I verified with Ms. Hatch that she was the young lady that was working for the Hoffman's and that Deputy Williams and I had spoken to briefly on the night of June 23, 2015.  I requested that Ms. Hatch come to my office today at which time she advised me that she had just started a new job in The Woodlands and that she wouldn't be getting off work until around 5:00 P.M. or 7:00 P.M.  Ms. Hatch stated that she would be willing to meet with me at a different time.  I informed Ms. Hatch that I would be in contact with her in the future and we would work something out at that time.  The conversation with Ms. Hatch was then concluded.

**10:35 A.M.**    I spoke with ADA Ciborowski and advised her that I would like to obtain a search warrant based on the tampering aspect of this investigation that would authorize me to physically take the Hoffman's cell phones from their persons.  ADA Ciborowski requested that I prepare the probable cause statement and then get with her at that time.  Once the PC statement was completed and reviewed by ADA Ciborowski and ADA Holley, a search warrant to seize the Hoffman's cell phones was drafted.

**12:57 P.M.**    I met with ADA Holley and ADA Ciborowski to review and discuss our witness list regarding this multifaceted criminal investigation.

**1:15 P.M.**    I placed a call to the 359th District Court in hopes of making contact with Judge Hamilton to have her review and sign the search warrant regarding the Hoffman's cell phones. I was advised that Judge Hamilton was out of the office today but that she was available by cell. I was able to make telephone contact with Judge Hamilton who offered to allow me to come to her residence for her to review the listed search warrant.  I advised Judge Hamilton that I didn't want to bother her on her time out of the office and that I would pursue the on-call judge for their review.  The on-call judge is Judge Seiler from the 435th District Court.

**3:53 P.M.**    I met with Judge Seiler in his courtroom at which time he reviewed and signed the search warrant authorizing seizure of the Hoffman's cell phones.  Judge Seiler maintained a copy of said search warrant and then provided me with the original.  I have included the original search warrant in this case file for review.  It was determined that we would hold the search warrant for execution due to my knowledge that the Hoffman's were actively involved in a seizure hearing in the court of JP#1, Judge Wayne Mack.

**5:40 P.M.**    I placed a return call to 936-230-8410 regarding a message that was left at the District Attorney's Office on this date at approximately 3:35 P.M. by a Justin Higgins.  I was unable to make contact with this person but was able to leave a voice message requesting a return call.

**5:43 P.M.**      I placed a return call to 936-524-8002 regarding a message that was left at the District Attorney's Office on an unknown date at an unknown time by a Jamie Atwood. I was unable to make contact with this person but was able to leave a voice message requesting a return call.

**5:46 P.M.**      I placed a return call to 281-435-9916 regarding a message that was left at the District Attorney's Office on an unknown date at an unknown time by a Sarah Hall. I was unable to make contact with this person but was able to leave a voice message requesting a return call.

**5:50 P.M.**      I received a return call in my office from Ms. Jamie Atwood who provided me with the following information. According to Ms. Atwood, she has known the Hoffman's since 1997 and at one time or another has boarded horses at the Hoffman property. She has not been to the Hoffman's in about five years. She is not currently on speaking terms with the Hoffman's. Ms. Atwood further advised that Herman Hoffman did not like the horses and was always threatening to kill them. She believes that the horses were more Kathleen Hoffman's project. Ms. Atwood never witnessed the horses in this king of neglected condition. Ms. Atwood informed me that the Hoffman's stored files in the bathroom area of the office in the big barn as well as the bedrooms in their residence. Ms. Atwood had no further information to add at this time. The call was concluded at approximately 6:00 P.M.

**6:05 P.M.**      I placed a return call to 832-716-2489 regarding a message that was left at the District Attorney's Office on an unknown date at an unknown time by a Wayne Lockey. I was able to make telephone contact with Mr. Lockey who wished to provide the following information. Mr. Lockey stated that he worked for the Hoffman's off and on between 2005 and 2007. The horses were in good condition during that time period. He believes Mr. Hoffman had a contract with Uncle Ben's Rice for feed. An individual by the name of Chris Thornton worked with Mr. Lockey during this period of time. Mr. Lockey had heard that Mr. Hoffman had poisoned about twenty horses and killed them for insurance money but had nothing to substantiate this allegation. The call was concluded at approximately 6:15 P.M.

**JULY 1, 2015**

**8:25 A.M.**      I emailed the photographs regarding the return for the search warrant which had been executed on 06-24-2015 to my email and printed them out for attachment to the return. The email is included in the file along with a copy of the return.

**9:04 A.M.**      I arrived on scene at 10066 League Line Road to execute a search warrant for the cell phones of Herman and Kathleen Hoffman. I was accompanied by the following District Attorney personnel:

ADA Mike Holley
Investigator Gale Echols

I actually met with them outside in the driveway of their residence. Kathleen Hoffman had her phone in her possession but Herman Hoffman was in possession of a new phone which was not listed in the search warrant. I then escorted Mr. Hoffman into his residence at which time he provided me with the cell phone that was identified in the search warrant. I collected both phones from the Hoffman's without incident and provided them with a copy of the search warrant along with a copy of the search warrant return. We departed from the Hoffman location at approximately 9:35 A.M.

**10:20 A.M.**     I spoke with District Attorney Investigator Nikki Neeley about the above mentioned cell phones and advised her that I would need a download of the phones to be completed. I further advised Investigator Neeley that I would submit the evidence along with a copy of the search warrant in the D.A. ICAC Forensics Lab and that it would be there waiting for her.

**10:24 A.M.**     I was assigned case number 15W000008 for this investigation by the Montgomery County Sheriff's Office Dispatch.

**10:45 A.M.**     I delivered the cell phone evidence along with a copy of the search warrant to the D.A. ICAC Forensics Lab.

**10:48 A.M.**     I delivered the search warrant return to the 359th District Court. This specific return was in regards to the search warrant that was executed on 06-24-2015.

**10:55 A.M.**     I delivered the search warrant return to the 435th District Court. This specific return was in regards to the search warrant that was executed on today's date (07-01-2015) regarding the cell phones.

**NO FURTHER INFORMATION AT THIS TIME**

# EXHIBIT 8

(Seizure Warrant, Application for Warrant, and Return of Warrant June 24, 2015 –
Deputy Constable Marshall Williams)

THE STATE OF TEXAS                    §
                                      §
COUNTY OF MONTGOMERY                  §

SEARCH WARRANT

The State of Texas: To the Sheriff or any Peace Officer of Montgomery County, Texas, or any Peace Officer of the State of Texas:

Whereas I have been presented an affidavit requesting issuance of a search warrant by the affiant therein, and whereas I find that the verified facts stated by affiant in said affidavit show that affiant has probable cause for the belief he/she expresses therein, and whereas I believe said affidavit properly establishes grounds for issuance of this Warrant;

Now, therefore, you are commanded to enter the suspected place, vehicles, and premises described in said affidavit, to-wit:  **Owner or physical addresses of 9950 League Line Road and/or 10066 League Line Road, Conroe, Montgomery County, Texas.  Associated with the premises to be searched is a property to be searched called Calico Dairy/Premium star. The website for Calico Dairy describes the premises as being located at 10066 League Line Rd., Conroe, Texas. The description further is called a Texas State licensed Grade A Raw to Retail Dairy. The website identifies the owners of the premises as Herman and Kathleen Hoffman.  The premises is further described as being within an approximate 40 acre tract of land and located approximately 1.1 miles West of I-45 (on League Line Road).  The premises is located within a Northern boundary of approximately 1017'; an Eastern boundary of approximately 2020'; a Southern boundary (fronting League Line Road) of approximately 880' and a Western boundary of approximately 2032'.**  Said suspected place, in addition to the foregoing description, also includes all other buildings, structures, places and vehicles on said premises and within the curtilage, if said premises is a residence, that are found to be under the control of the suspected party named below and in, on, or around which said suspected party may reasonably reposit or secrete property that is the object of the search requested herein.  The premises is further described by Exhibit A, a diagram illustrating portions of the premises to be searched, and Exhibits B through E, Google Earth photographs illustrating the location or appearance of the premises to be searched, as attached to the Affidavit for Search Warrant,  herein.

At said place and premises you shall search for and, if same be found, seize and bring before me the property described in the affidavit, to-wit:  Any evidence of cruelty to livestock animals or tampering with physical evidence including but not limited to: any livestock animal appearing to be malnourished, injured, sick or not being provided necessary food, water or care; any livestock animal  appearing to be unreasonably abandoned; any livestock animal appearing to be transported or confined in a cruel or unusual manner; any livestock animal appearing to be seriously overworked;  all documents whether hard copies or in digital or other form showing the number of animals on the premises at any given time; documents showing the purchase of animals, sale of animals, transport or movement of animals; documents showing medical supplies or food purchased for animals; medicine or medical supplies; records showing medical treatment requested or received for animals; any correspondence by any person associated with the premises to be searched and any animal health care provider; employment records of any person currently or formerly employed by any person associated with the premises to be searched; carcasses of livestock animals; burn piles of suspected livestock animals;  any evidence of tampering with livestock animals;

It is further ordered that any and all property seized by authority of this Warrant or during the execution thereof shall be and remain under the care, custody, and control of any peace officer to whom this Warrant is delivered for execution. Further, said property may be removed and taken to any location as deemed necessary by such peace officer for purposes of safekeeping and completion of any investigation or proceedings related to the activities described in the Affidavit upon which the foregoing Warrant was issued.

Herein fail not, but have you then and there this Warrant to be executed without delay; and upon compliance with the orders herein, make return forthwith showing how you have executed same within three days of the date shown below, exclusive of said date and the day of its execution.

Issued this the 24 day of _June_, ____, at _1:36_ o'clock _P_.M., to certify which witness my hand this day.

_[signature]_

JUDGE, 359th District Court
Montgomery County, Texas

THE STATE OF TEXAS       §
                                    §

COUNTY OF **MONTGOMERY**     §

## RETURN AND INVENTORY

BEFORE ME, THE UNDERSIGNED AUTHORITY, PERSONALLY APPEARED THE AFFIANT HEREIN, A PEACE OFFICER UNDER THE LAWS OF TEXAS, WHO, BEING DULY SWORN, ON OATH MADE THE FOLLOWING STATEMENTS:

My name is **Marshall Williams** and I am commissioned as a peace officer by **The Montgomery County Constable, Precinct 5, Office**.

The attached Search Warrant came to hand on the day it was issued and it was executed on the 24th day of June, 2015, by conducting the search directed therein and by seizing during such search the following described property:

All property seized is listed and described on the attached page(s) entitled "Exhibit A."

Affiant

The Montgomery County District Attorney's Office (RECEIVED

he following item(s) to/from _Hoffman search war_

with _Ma_

reference Agency Case # _____.

| ITEM # | DESCRIPTION |
|--------|-------------|
| 1 | 2 boxes docs from Living Room |
| 2 | Fujifilm camera from Living Room |
| 3 | 1 box docs from dining Room |
| 4 | 4 boxes documents from office |
| 5 | Dell desktop from office |
| 6 | Dell Desktop from Barn    CN-OT695 |
| 7 | Gateway laptop from barn |
| 8 | hp desktop from barn |
| 9 | 1 box docs from barn |
| 10 | Samsung tablet   CEO1108①  from barn |

DEFENDANTS NAME: _____

COURT CAUSE NUMBER: _____

Received By:

_G210_

Signature

_M Smith_

Printed Name

_le'ison_

Received From:

_____

Signature

_____

Printed Name

EXHIBIT 9

(MCDA, Brett Ligon, June 25, 2015 Press Release)



## Brett W. Ligon
District Attorney

Phil Grant
First Assistant District Attorney

9th Judicial District
207 W. Phillips, 2nd Floor
Conroe, Texas  77301

Ofc: (936) 539-7800
Fax: (936) 760-6940

# ARRESTS FOR ANIMAL CRUELTY ON LEAGUE LINE ROAD
## June 25, 2015

**Conroe, Texas, June 25, 2015** – Yesterday a combined effort by the District and County Attorney's Office resulted in arrests for animal cruelty and seizure of a large number of horses on League Line Road.

District Attorney Brett Ligon lead a team of law enforcement officers in serving a search warrant at the premises of Calico Dairy and Premium Star Horses operated by Herman and Kathleen Hoffman just north of Conroe. The Hoffmans have approximately 200 horses on the property as well as a number of goats and dairy cows. Law enforcement officers have been investigating the Hoffmans' operation for several months, but recent significant declines in the welfare of the animals prompted Mr. Ligon and his office to pursue and obtain a search warrant for the property.

Following a long day at the property, Herman and Kathleen Hoffman were arrested on three charges each of animal cruelty. Additional charges are being investigated as well. Judge Kathleen Hamilton of the 359^th District Court set the Hoffmans' bond at $11,500 per defendant.

The County Attorney's Office obtained an order from Judge Wayne Mack to temporarily seize the horses targeted in the investigation. Given the size of the herd and the conditions of the animals, the majority of the horses will remain on the farm. Law enforcement officers from the Montgomery County Sheriff's Office will remain on the property around the clock to ensure the animals are protected while they receive care. The Houston Society for the Protection of Cruelty to Animals are working closely with the District and County Attorneys' Office, and the SPCA is currently assessing the condition of the horses and addressing the problems found. The focus of the SPCA and the County is to provide the necessary care for the animals.

Mr. Ligon stated that although law enforcement had done everything possible to work with the Hoffmans' to ensure adequate care for the horses involved, ultimately it became clear that more direct action was required. Mr. Ligon recommended that anyone interested in assisting with the care of the horses contact the Houston SPCA at 713-869-SPCA (7722).

"This is a massive undertaking that has required and will require a tremendous amount of time and financial resources in order to save and support these horses over the long term," stated District Attorney Brett Ligon. "The Houston SPCA is leading the efforts to provide veterinary and basic care to those horses that need it and they should be the contact for those wishing to donate their time or money to the cause. We will continue to partner with the County Attorney and other law enforcement officials to obtain justice for these animals."

# EXHIBIT 10

(Seizure Warrant, Application for Warrant, and Return of Warrant June 24, 2015 –
Deputy Constable Gordon Welch)

## WARRANT FOR ANIMAL SEIZURE



STATE OF TEXAS
COUNTY OF     MONTGOMERY

**To any Sheriff, Constable or Peace Officer of the State of Texas, Greeting:**

Whereas application in writing, under oath, has been made before me by **Deputy GORDON WELCH**, a true and exact copy of which application is attached hereto and expressly incorporated herein and made a part hereof, and said application having stated facts and information in my opinion sufficient to establish probable cause for the issuance of this warrant:

**You are therefore commanded** to forthwith seize and impound the animals described in said application which are alleged to have been cruelly treated, and you will also give written notice to **Herman Hoffman and Kathleen Hoffman**, the alleged owner of said animals, that a hearing will be held in the **JUSTICE COURT PCT. 1 of MONTGOMERY** County, Texas, at 300 S. Danville St., **Willis Texas**, on the 30th day of June, 2015, at 2:00 p.m. (being a date within 10 days of the issuance of this warrant) to determine whether the animals have been cruelly treated.

Herein fail not, and make due return to me at the place above named.

Witness my signature on this the 24 day of June, 2015.

_____
Judge or Justice of the Peace
Montgomery County, Texas

## OFFICER'S RETURN

Come to hard on the same day issued, and executed on the _____ day of _____ by seizing and impounding the following animals believed by me to be the same animals described in said warrant, to wit:

_____
_____
_____

which said animals I found at said location, and by delivery of the written notice of the hearing set forth in said warrant to _____, the alleged owner of said animals, in obedience to the command of said warrant.

_____

A true copy, I hereby certify
WAYNE L. MACK, Justice of the Peace, Pct.1
Montgomery County, Texas

Issued _9-2-16_

By _____, Clerk

## WARRANT FOR ANIMAL SEIZURE

STATE OF TEXAS
COUNTY OF      MONTGOMERY

**To any Sheriff, Constable or Peace Officer of the State of Texas, Greeting:**

    Whereas application in writing, under oath, has been made before me by **Deputy GORDON WELCH**, a true and exact copy of which application is attached hereto and expressly incorporated herein and made a part hereof, and said application having stated facts and information in my opinion sufficient to establish probable cause for the issuance of this warrant.

    **You are therefore commanded** to forthwith seize and impound the animals described in said application which are alleged to have been cruelly treated, and you will also give written notice to **Herman Hoffman and Kathleen Hoffman**, the alleged owner of said animals that a hearing will be held in the **JUSTICE COURT PCT. 1 of MONTGOMERY** County, Texas, at 300 S. Danville St., **Willis Texas**, on the 30th day of June, 2015, at 2:00 p.m. (being a date within 10 days of the issuance of this warrant) to determine whether the animals have been cruelly treated.

    Herein fail not, and make due return to me at the place above named.

Witness my signature on this the 24 day of June, 2015. _Wayne L. Mack_

_____
Judge or Justice of the Peace
Montgomery County, Texas

### OFFICER'S RETURN

    Come to hard on the same day issued, and executed on the _24_ day of _June 2015_ by seizing and impounding the following animals believed by me to be the same animals described in said warrant, to wit: _approximately 200 horses, at 10066 and 9955 League Line Road_

which said animals I found at said location, and by delivery of the written notice of the hearing set forth in said warrant to _Herman Hoffman_ , the alleged owner of said animals, in obedience to the command of said warrant. _Kathleen Hoffman_

_Deputy Gordon Welch 8585_

_Kathleen Hoffman served at 10:20 pm_
_Herman Hoffman served at 11 pm_

ORIGINAL

A true copy, I hereby certify
WAYNE L. MACK, Justice of the Peace, Pct.1
Montgomery County, Texas

Issued _9-12-16_
By _____ ,Clerk

## APPLICATION FOR WARRANT TO SEIZE ANIMAL(S)
### (UNDER 821.022,TEXAS HEALTH AND SAFETY CODE)

STATE OF TEXAS
COUNTY OF MONTGOMERY

    I, __Deputy Gordon Welch_____, CONSTABLE OF MONTGOMERY
COUNTY, TEXAS, DO SOLEMNLY SWEAR THAT I HAVE REASON TO BELIEVE AND DO
BELIEVE THAT ANIMALS LOCATED IN MONTGOMERY COUNTY, TEXAS HAVE BEEN AND
ARE BEING CRUELLY TREATED IN THAT:__The horses have been unreasonably deprived of
necessary food, care, or shelter, or cruelly
confined._____

_____

THE ANIMALS ARE DESCRIBED AS_ approximately 200
horses_____

_____
_____
_____
_____

SAID ANIMALS ARE LOCATED IN MONTGOMERY COUNTY AT:_10066 League Line Road, 9955
League Line road_.  Conroe
Texas._____

MY BELIEF OF THE FOREGOING IS BASED ON THE FOLLOWING FACTS:_due  to the poor body
condition of numerous horses on location , the lack of hoof care for numerous horses on location, and poor
living conditions of numerous horses on location I believe that the horses are not being adequately cared for
and are being neglected.  I request that the horses be seized and be housed on and off the property under the
care and direction  of the  Houston SPCA and Montgomery County Pct 5.. I also request that law
enforcement be allowed to provide 24 hour security on the property and that the Houston SPCA be allowed
unlimited access to care for and remove horses at any time until this court determines the disposition of the
animals._Please see attached photographs as a representation of a portion of the
horses_____

_____
_____
_____
_____
_____

WHEREFORE, I ASK THAT A WARRANT TO SEIZE THE SAID ANIMALS BE ISSUED IN
ACCORDANCE WITH THE LAW IN SUCH CASES PROVIDED.

CONSTABLE OF MONTGOMERY
COUNTY, TEXAS

A true copy, I hereby certify
WAYNE L. MACK, Justice of the Peace, Pct.1
Montgomery County, Texas

Issued____9-12-16_____

By_____MR_____ ,Clerk

SWORN AND SUBSCRIBED TO BEFORE ME BY THE SAID Gordon Welch ON THIS 24th DAY OF June ____, 20 15

NOTARY PUBLIC

MY COMMISSION EXPIRES 3-26-16

SHELBY ARNOLD
Notary Public, State of Texas
My Commission Expires 03-26-2016

CASE NUMBER_15U000136_____

A true copy, I hereby certify
WAYNE L. MACK, Justice of the Peace, Pct.1
Montgomery County, Texas
Issued____9-12-16
By_____MLR_____,Clerk





06/24/2015

EXHIBIT 11

(July 8, 2015 Order of Justice of the Peace Wayne Mack )

EXHIBIT 12

(August 4, 2015 Order by Judge Michael Seiler)

RECEIVED

Cause Number 1AS0019   2015 JUL -8 PM 7: 17

JUDGE WAYNE L. MACK
JP. PCT.1
MONTGOMERY COUNTY

| | | |
|---|---|---|
| In RE: | | |
| STATE OF TEXAS | § | State of Texas |
| | § | County of Montgomery |
| VS. | § | In Justice Court |
| | § | |
| HERMAN HOFFMAN | § | Precinct 1 |

Cause Number 1AS0019-B

| | | |
|---|---|---|
| In RE: | | |
| STATE OF TEXAS | § | State of Texas |
| | § | County of Montgomery |
| VS. | § | In Justice Court |
| | § | |
| KATHLEEN HOFFMAN | § | Precinct 1 |

## AMENDED ORDER
(Tex. Health & Safety Code §821.023)

On this the 30TH day of June, 2015 came to be considered the above-referenced matters pursuant to Chapter 821 of the Texas Health and Safety Code. This Court determined that it has jurisdiction over the subject matter in controversy and that venue was proper. All parties being present: Herman Hoffman and Kathleen Hoffman, the owners or reputed owners of the approximately 200 horses located at 10066 League Line Road, 9955 League Line Road and connected and adjacent properties in Conroe, Montgomery County, Texas 77304 and Stuart Hughes Assistant County Attorney.

The Court finds as follows:

1. On or about June 25, 2015, approximately two hundred (200) horses located at 10066 League Line Road, 9955 League Line Road and connected and adjacent properties in Conroe, Montgomery County, Texas 77304 were seized pursuant to a seizure warrant issued by this Court and served upon Herman Hoffman and Kathleen Hoffman;

2. The seized horses were placed in the custody of the Montgomery County Constable as the same were found and are subject to the jurisdiction of this Court;

3. Herman Hoffman and/or Kathleen Hoffman are the owners (as defined in §821.021 of the Texas Health & Safety Code) of all the horses located at 10066 League Line Road, 9955

A true copy, I hereby certify
WAYNE L. MACK, Justice of the Peace, Pct.1
Montgomery County, Texas

Issued ___9-12-16___

By ___[signature]___

League Line Road and connected and adjacent properties which properties are owned or controlled by Herman Hoffman and/or Kathleen Hoffman or companies owned or controlled by Herman Hoffman and/or Kathleen Hoffman; and

4. Herman Hoffman and/or Kathleen Hoffman cruelly treated all the horses located at 10066 League Line Road, 9955 League Line Road and connected and adjacent properties which properties are owned or controlled by Herman Hoffman and/or Kathleen Hoffman or companies owned or controlled by Herman Hoffman and/or Kathleen Hoffman (hereinafter the "Horses");

IT IS THEREFORE ORDERED that Herman Hoffman and/or Kathleen Hoffman are hereby divested of ownership and title to the Horses and it is further ORDERED that the Horses are given to Houston SPCA, a non-profit animal welfare organization whose principal office is located at 900 Portway Dr., Houston, Texas 77024.

The Court further finds that the court costs, including the administrative costs of investigation and expert witnesses and the costs incurred by Houston SPCA, a nonprofit animal welfare organization, for housing and caring for the Horses during its impoundment is One Hundred Twenty-two Thousand, Two Hundred fifty-four and 87/100 ($122,254.87) dollars which costs are taxed against Herman Hoffman and Kathleen Hoffman, jointly and severally.

The Court further finds that the estimated costs likely to be incurred by Houston SPCA, a non-profit animal welfare organization, to house and care for the impounded Horses during the appeal process is Twenty-seven Thousand, Seven Hundred forty-five and 13/100 ($27,745.13) dollars.

Pursuant to §§821.023 and 821.024 of the Texas Health & Safety Code, the bond for the appeal of this order is set at One Hundred Fifty Thousand and no/100 ($150,000.00) dollars.

GIVEN UNDER MY HAND AND SEAL, on this the 8th day of July, 2015, in Montgomery County, Texas.

Wayne L. Mack
Justice of the Peace, Precinct 1
Montgomery County, Texas

*Justice Court Seal*

A true copy, I hereby certify
WAYNE L. MACK, Justice of the Peace, Pct.1
Montgomery County, Texas
Issued  9-12-16
By  NR
                              ,Clerk

APPROVED AS TO FORM AND SUBSTANCE:

Stuart Hughes
Montgomery County Attorney's Office
Assistant County Attorney
TBN 24041151
501 N. Thompson, Ste. 300
Conroe, Texas 77301
Tel: (936) 539-7828  Fax: (936) 760-6920

A true copy, I hereby certify
WAYNE L. MACK, Justice of the Peace, Pct. 1
Montgomery County, Texas
issued  9-12-16
By_____ , Clerk

# EXHIBIT 12

(August 4, 2015 Order by Judge Michael Seiler)

1                    REPORTER'S RECORD

2          TRIAL COURT CAUSE NO. 15-28977

3   THE STATE OF TEXAS      :     IN THE COUNTY COURT AT
                            :
4   VS.                     :     LAW NUMBER TWO (2)
                            :
5   HERMAN HOFFMAN          :     MONTGOMERY COUNTY, TEXAS

6
            TRIAL COURT CAUSE NO. 15-28978
7
    THE STATE OF TEXAS      :     IN THE COUNTY COURT AT
8                           :
    VS.                     :     LAW NUMBER TWO (2)
9                           :
    KATHLEEN HOFFMAN        :     MONTGOMERY COUNTY, TEXAS
10

11

12     ******************************************

13                    BENCH TRIAL

14     ******************************************

15

16

17          On July 30, 2015, the following proceedings

18   came on to be heard in the above-entitled and numbered

19   cause before the Honorable Michael T. Seiler, Judge

20   Presiding, held in Conroe, Montgomery County, Texas.

21          Proceedings reported by machine shorthand and

22   computer-aided transcription.

23

24                      COPY

25

Received and E-Filed for Record
8/4/2015 9:53:53 AM
Mark Turnbull
County Clerk
Montgomery County, Texas
15-28977

## Cause Number 15-28977

| | | |
|---|---|---|
| **STATE OF TEXAS** | § | **In the County Court at Law** |
| | § | |
| **VS.** | § | **Number Two (2)** |
| | § | |
| **HERMAN HOFFMAN** | § | **Montgomery County, Texas** |

---

## Cause Number 15-28978

| | | |
|---|---|---|
| **STATE OF TEXAS** | § | **In the County Court at Law** |
| | § | |
| **VS.** | § | **Number Two (2)** |
| | § | |
| **KATHLEEN HOFFMAN** | § | **Montgomery County, Texas** |

## JUDGMENT
### (Tex.Health & Safety Code, Chapter 821)

On this the 30TH day of July, 2015 came to be considered the above-referenced matters pursuant to Chapter 821 of the Texas Health and Safety Code. This Court determined that it has jurisdiction over the subject matter in controversy and that venue was proper. All parties being present: Herman Hoffman and Kathleen Hoffman, the owners or reputed owners of the approximately 200 horses located at 10066 League Line Road, 9955 League Line Road and connected and adjacent properties in Conroe, Montgomery County, Texas 77304, by and through their attorney of record Melvyn Bruder, and Stuart Hughes Assistant County Attorney on behalf of the State of Texas.

The Court finds as follows:

1. On or about June 25, 2015, two hundred and seven (207) horses located at 10066 League Line Road, 9955 League Line Road and connected and adjacent properties in Conroe, Montgomery County, Texas 77304 were seized pursuant to a seizure warrant issued by Justice of the Peace, Precinct One and served upon Herman Hoffman and Kathleen Hoffman;

2. The seized horses were placed in the custody of the Montgomery County Constable as the same were found and are subject to the jurisdiction of this Court;

3. Herman Hoffman and/or Kathleen Hoffman are the owners (as defined in §821.021 of the Texas Health & Safety Code) of all the horses previously located at 10066 League Line

Received and E-Filed for Record
8/4/2015 9:53:53 AM
Mark Turnbull
County Clerk
Montgomery County, Texas
15-28977

Road, 9955 League Line Road and connected and adjacent properties which properties are owned or controlled by Herman Hoffman and/or Kathleen Hoffman or companies owned or controlled by Herman Hoffman and/or Kathleen Hoffman and made the subject of this action; and

4. Herman Hoffman and/or Kathleen Hoffman cruelly treated all the horses located at 10066 League Line Road, 9955 League Line Road and connected and adjacent properties which properties are owned or controlled by Herman Hoffman and/or Kathleen Hoffman or companies owned or controlled by Herman Hoffman and/or Kathleen Hoffman (hereinafter the "Horses");

IT IS THEREFORE ORDERED that Herman Hoffman and/or Kathleen Hoffman are hereby divested of ownership and title to the Horses and it is further ORDERED that the Horses are given to Houston SPCA, a non-profit animal welfare organization whose principal office is located at 900 Portway Dr., Houston, Texas 77024.

The Court further finds that the court costs, including the administrative costs of investigation and expert witnesses and the costs incurred by Houston SPCA, a nonprofit animal welfare organization, for housing and caring for the Horses during its impoundment is Four Hundred Eighty-Five Thousand, Three Hundred thirty-one and 68/100 ($485,331.68) dollars which costs are taxed against Herman Hoffman and Kathleen Hoffman, jointly and severally, for which let execution lie.

**GIVEN UNDER MY HAND AND SEAL**, on this the ____ day of _____, 2015, in Montgomery County, Texas.

Hon. Michael T. Seiler
Presiding Judge
of County Court at Law Number Two
Montgomery County, Texas

Aug '04 2015 9:23AM Mel Bruder 2149873518

Received and E-filed for Record
8/4/2015 9:53:53 AM
Mark Turnbull
County Clerk
Montgomery County, Texas

07-31-15;11:04   ;From:Worthess Check Dept.     To:912149873518   ;936 539-28877     #  4/  4

APPROVED AS TO FORM AND SUBSTANCE:

Stuart Hughes
Montgomery County Attorney's Office
Assistant County Attorney
TBN 24041151
501 N. Thompson, Ste. 300
Conroe, Texas 77301
Tel: (936) 539-7828   Fax: (936) 760-6920

Melvyn Carson Bruder
Attorney for Herman and Kathleen
Hoffman
TBN
6440 North Central Expressway
516 Turley Law Center
Dallas, Texas 75206
(214) 987-3500
(214) 987-3518